**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2067
_____

B.H., A MINOR, BY AND THROUGH HER MOTHER;
JENNIFER HAWK; K.M., A MINOR BY AND
THROUGH HER MOTHER;
AMY MCDONALD-MARTINEZ

v.

EASTON AREA SCHOOL DISTRICT,
                                                    Appellant
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 5-10-cv-06283)
District Judge:  Honorable Mary A. McLaughlin
_____

Argued on April 10, 2012
Rehearing En Banc Ordered on August 16, 2012
Argued En Banc February 20, 2013
_____

Before: McKEE, *Chief Judge*, SLOVITER, SCIRICA,
RENDELL, AMBRO, FUENTES, SMITH, FISHER,
CHAGARES, JORDAN, HARDIMAN,
GREENAWAY, JR., VANASKIE, and GREENBERG,
*Circuit Judges*

(Opinion filed: August 5, 2013)

Keely J. Collins
John E. Freund, III          [ARGUED]
Jeffrey T. Tucker
King, Spry, Herman, Freund & Faul
One West Broad Street, Suite 700
Bethlehem, PA 18018

          *Counsel for Appellant*

Seth F. Kreimer
University of Pennsylvania School of Law
3400 Chestnut Street
Philadelphia, PA 19104

Mary Catherine Roper     [ARGUED]
American Civil Liberties Union of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106

Molly M. Tack-Hooper
Berger & Montague

1622 Locust Street
Philadelphia, PA 19103

Witold J. Walczak
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213

*Counsel for Appellees*

Sean A. Fields
Pennsylvania School Boards Association
400 Bent Creek Boulevard
P.O. Box 2042
Mechanicsburg, PA 17055

*Counsel for Amicus Appellant*

Wilson M. Brown, III
Kathryn E. Deal
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square, Suite 2000
Philadelphia, PA 19103

Rory Wicks
Gary L. Sirota
1140 South Coast Highway 101
Encinitas, CA 92024

Amy R. Arroyo
2251 Las Palmas Drive
Carlsbad, CA 92011

Wayne Pollock
Dechert LLP
2929 Arch Street, 18th Floor Cira Centre
Philadelphia, PA 19104

Frank D. LoMonte
Laura Napoli
Student Press Law Center
1101 Wilson Boulevard, Suite 1100
Arlington, VA 22209

Terry L. Fromson
Carol E. Tracey
Women's Law Project
125 South 9th Street, Suite 300
Philadelphia, PA 19107

David L. Cohen
3320 Market Street, Suite 232
Philadelphia, PA 19104

*Counsel for Amici Appellees*

———————————

OPINION

———————————

SMITH, *Circuit Judge*, with whom McKEE, *Chief Judge,* SLOVITER, SCIRICA, RENDELL, AMBRO, FUENTES, FISHER, and VANASKIE, *Circuit Judges* join.


Once again, we are asked to find the balance between a student's right to free speech and a school's need to control its educational environment. In this case, two middle-school students purchased bracelets bearing the slogan "I ♥ boobies! (KEEP A BREAST)" as part of a nationally recognized breast-cancer-awareness campaign. The Easton Area School District banned the bracelets, relying on its authority under *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), to restrict vulgar, lewd, profane, or plainly offensive speech, and its authority under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), to restrict speech that is reasonably expected to substantially disrupt the school. The District Court held that the ban violated the students' rights to free speech and issued a preliminary injunction against the ban.

We agree with the District Court that neither

*Fraser* nor *Tinker* can sustain the bracelet ban. The scope of a school's authority to restrict lewd, vulgar, profane, or plainly offensive speech under *Fraser* is a novel question left open by the Supreme Court, and one which we must now resolve. We hold that *Fraser*, as modified by the Supreme Court's later reasoning in *Morse v. Frederick*, 551 U.S. 393 (2007), sets up the following framework: (1) plainly lewd speech, which offends for the same reasons obscenity offends, may be categorically restricted regardless of whether it comments on political or social issues, (2) speech that does not rise to the level of plainly lewd but that a reasonable observer could interpret as lewd may be categorically restricted as long as it cannot plausibly be interpreted as commenting on political or social issues, and (3) speech that does not rise to the level of plainly lewd and that could plausibly be interpreted as commenting on political or social issues may not be categorically restricted. Because the bracelets here are not plainly lewd and because they comment on a social issue, they may not be categorically banned under *Fraser*. The School District has also failed to show that the bracelets threatened to substantially disrupt the school under *Tinker*. We will therefore affirm the District Court.

# I.

## A.  Factual background

As a "leading youth focused global breast cancer organization," the Keep A Breast Foundation tries to educate thirteen- to thirty-year-old women about breast cancer.  Br. of Amicus Curiae KABF at 13.  To that end, it often partners with other merchants to co-brand products that raise awareness.  And because it believes that young women's "negative body image[s]" seriously inhibit their awareness of breast cancer, the Foundation's products often "seek[] to reduce the stigma by speaking to young people in a voice they can relate to."  *Id.* at 14–15.  If young women see such awareness projects and products as cool and trendy, the thinking goes, then they will be more willing to talk about breast cancer openly.

To "start a conversation about that taboo in a light-hearted way" and to break down inhibitions keeping young women from performing self-examinations, the Foundation began its "I ♥ Boobies!" initiative.  *Id.* at 20–21.  Part of the campaign included selling silicone bracelets of assorted colors emblazoned with "I ♥ Boobies! (KEEP A BREAST)" and "check y♥urself! (KEEP A BREAST)."  *Id.* at 21–22.  The Foundation's website address (www.keep-a-breast.org) and motto ("art. education. awareness. action.") appear on the inside of the bracelet.  *Id.*

7

As intended, the "I ♥ Boobies" initiative was a hit with young women, quickly becoming one of the Foundation's "most successful and high profile educational campaigns." *Id.* at 20–21. Two of the young women drawn to the bracelets were middle-school students B.H. and K.M. They purchased the bracelets with their mothers before the 2010–2011 school year— B.H. because she saw "a lot of [her] friends wearing" the bracelets and wanted to learn about them, and K.M. because of the bracelet's popularity and awareness message. App. 72, 92, 106, 442.

But the bracelets were more than just a new fashion trend. K.M.'s purchase prompted her to become educated about breast cancer in young women. The girls wore their bracelets both to commemorate friends and relatives who had suffered from breast cancer and to promote awareness among their friends. Indeed, their bracelets started conversations about breast cancer and did so far more effectively than the more-traditional pink ribbon. App. 73–74. That made sense to B.H., who observed that "no one really notices" the pink ribbon, whereas the "bracelets are new and . . . more appealing to teenagers." App. 74.

B.H., K.M., and three other students wore the "I ♥ boobies! (KEEP A BREAST)" bracelets at Easton Area Middle School during the 2010–2011 school year. A few teachers, after observing the students wear the bracelets

every day for several weeks, considered whether they should take action. The teachers' responses varied: One found the bracelets offensive because they trivialized breast cancer. Others feared that the bracelets might lead to offensive comments or invite inappropriate touching. But school administrators also believed that middle-school boys did not need the bracelets as an excuse to make sexual statements or to engage in inappropriate touching. *See, e.g.*, Viglianti Test., App. 196, 198 (testifying that such incidents "happened before the bracelets" and were "going to happen after the bracelets" because "sexual curiosity between boys and girls in the middle school is . . . a natural and continuing thing").

In mid- to late September, four or five teachers asked the eighth-grade assistant principal, Amy Braxmeier, whether they should require students to remove the bracelets. The seventh-grade assistant principal, Anthony Viglianti, told the teachers that they should ask students to remove "wristbands that have the word 'boobie' written on them," App. 343, even though there were no reports that the bracelets had caused any in-school disruptions or inappropriate comments.[1]

---

[1] In mid-October before the ban was publicly announced, school administrators received some unrelated reports of inappropriate touching, but neither the word "boobies" nor the bracelets were considered a cause of these incidents.

With Breast Cancer Awareness Month approaching in October, school administrators anticipated that the "I ♥ boobies! (KEEP A BREAST)" bracelets might reappear.[2] The school was scheduled to observe Breast Cancer Awareness Month on October 28, so the day before, administrators publicly announced, for the first time, the ban on bracelets containing the word "boobies." Using the word "boobies" in his announcement, Viglianti notified students of the ban over the public-address system, and a student did the same on the school's television station. The Middle School still encouraged students to wear the traditional pink, and it provided teachers who donated to Susan G. Komen for the Cure with either a pin bearing the slogan "Passionately Pink for the Cure" or a T-shirt reading "Real Rovers Wear Pink."

Later that day, a school security guard noticed B.H. wearing an "I ♥ boobies! (KEEP A BREAST)" bracelet and ordered her to remove it. B.H. refused. After meeting with Braxmeier, B.H. relented, removed her bracelet, and returned to lunch. No disruption occurred at any time that day.

The following day, B.H. and K.M. each wore their "I ♥ boobies! (KEEP A BREAST)" bracelets to observe

---

[2] The Middle School permits students to wear the Foundation's "check y♥urself (KEEP A BREAST)" bracelets.

the Middle School's Breast Cancer Awareness Day. The day was uneventful—until lunchtime. Once in the cafeteria, both girls were instructed by a school security guard to remove their bracelets. Both girls refused. Hearing this encounter, another girl, R.T., stood up and similarly refused to take off her bracelet. Confronted by this act of solidarity, the security guard permitted the girls to finish eating their lunches before escorting them to Braxmeier's office. Again, the girls' actions caused no disruption in the cafeteria, though R.T. told Braxmeier that one boy had immaturely commented either that he also "love[d] boobies" or that he "love[d] her boobies."

Braxmeier spoke to all three girls, and R.T. agreed to remove her bracelet. B.H. and K.M. stood firm, however, citing their rights to freedom of speech. The Middle School administrators were having none of it. They punished B.H. and K.M. by giving each of them one and a half days of in-school suspension and by forbidding them from attending the Winter Ball. The administrators notified the girls' families, explaining only that B.H. and K.M. were being disciplined for "disrespect," "defiance," and "disruption."

News of the bracelets quickly reached the rest of the Easton Area School District, which instituted a district-wide ban on the "I ♥ boobies! (KEEP A BREAST)" bracelets, effective on November 9, 2010. The only bracelet-related incident reported by school

administrators occurred weeks after the district-wide ban: Two girls were talking about their bracelets at lunch when a boy who overheard them interrupted and said something like "I want boobies." He also made an inappropriate gesture with two red spherical candies. The boy admitted his "rude" comment and was suspended for one day.[3]

This was not the first time the Middle School had banned clothing that it found distasteful. Indeed, the School District's dress-code policy prohibits "clothing imprinted with nudity, vulgarity, obscenity, profanity, and double entendre pictures or slogans."[4] Under the policy, seventh-grade students at the Middle School have been asked to remove clothing promoting Hooters and Big Pecker's Bar & Grill, as well as clothing bearing the phrase "Save the ta-tas" (another breast-cancer-awareness slogan). Typically, students are disciplined only if they actually refuse to remove the offending apparel when asked to do so.

## B.    Procedural history

---

[3] After the district-wide ban was in place, there were several incidents of middle-school boys inappropriately touching girls, but they were unrelated to the "I ♥ boobies! (KEEP A BREAST)" bracelets.

[4] B.H. and K.M. do not assert a facial challenge to the constitutionality of the dress-code policy.

Through their mothers, B.H. and K.M. sued the School District under 42 U.S.C. § 1983.[5]  Compl., ECF No. 1 ¶ 3, *B.H. v. Easton Area Sch. Dist.*, No. 5:10-CV-06283-MAM (E.D. Pa. Nov. 15, 2010).  They sought a temporary restraining order allowing them to attend the Winter Ball and a preliminary injunction against the bracelet ban.  *B.H. v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 394 (E.D. Pa. 2011).  At the District Court's urging, the School District reversed course and permitted B.H. and K.M. to attend the Winter Ball while retaining the option to impose a comparable punishment if the bracelet ban was upheld.  *Id.*  The District Court accordingly denied the motion for a temporary restraining order.  *Id.*

The District Court conducted an evidentiary hearing on the request for a preliminary injunction.  It soon became clear that the School District's rationale for disciplining B.H. and K.M. had shifted.  Although B.H.'s and K.M.'s disciplinary letters indicated only that they were being disciplined for "disrespect," "defiance," and "disruption," the School District ultimately based the ban

---

[5]  The District Court had both federal-question jurisdiction under 28 U.S.C. § 1331 and § 1983 jurisdiction under 28 U.S.C. § 1343(a)(3).  *See Max v. Republican Comm. of Lancaster Cnty.*, 587 F.3d 198, 199 n.1 (3d Cir. 2009).

13

on its dress-code policy[6] together with the bracelets' alleged sexual innuendo. According to the School District's witnesses, the Middle School assistant principals had conferred and concluded that the bracelets "conveyed a sexual double entendre" that could be harmful and confusing to students of different physical and sexual developmental levels. Sch. Dist.'s Br. at 9. And the principals believed that middle-school students, who often have immature views of sex, were particularly likely to interpret the bracelets that way. For its part, the Foundation explained that no one there "ever suggested that the phrase 'I (Heart) Boobies!' is meant to be sexy." App. 150. To that end, the Foundation had denied requests from truck stops, convenience stores, vending machine companies, and pornographers to sell the

---

[6] Even the Middle School administrators seemed unsure which words would be prohibited by the dress code. When deposed, Viglianti and principal Angela DiVietro testified that the word "breast" (as in apparel stating "keep-a-breast.org" or "breast cancer awareness") would be inappropriate because the word "breast" "can be construed as [having] a sexual connotation." App. 490, 497. At the District Court's evidentiary hearing, they reversed course. Viglianti stated that "keep-a-breast.org" would be appropriate "[i]n the context of Breast Cancer Awareness Month," and DiVeitro no longer believed the phrase "breast cancer awareness" was vulgar to middle-school students.

bracelets.

After the evidentiary hearing, the District Court preliminarily enjoined the School District's bracelet ban. According to the District Court, B.H. and K.M. were likely to succeed on the merits because the bracelets did not contain lewd speech under *Fraser* and did not threaten to substantially disrupt the school environment under *Tinker*. The District Court could find no other basis for regulating the student speech at issue. The School District appealed, and the District Court denied its request to stay the injunction pending this appeal.

**II.**

Although the District Court's preliminary injunction is not a final order, we have jurisdiction under 28 U.S.C. § 1292(a)(1), which grants appellate jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing, or dissolving injunctions." *See Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 252 n.10 (3d Cir. 2002). We review the District Court's factual findings for clear error, its legal conclusions *de novo*, and its ultimate decision to grant the preliminary injunction for abuse of discretion. *Id.* at 252. Four factors determine whether a preliminary injunction is appropriate:

> (1) whether the movant has a reasonable probability of success on the merits; (2)

15

whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest.

*Id.* (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170 (3d Cir. 2001)). The District Court concluded that all four factors weighed in favor of B.H. and K.M. In school-speech cases, though, the first factor—the likelihood of success on the merits—tends to determine which way the other factors fall. *Id.* at 258. Because the same is true here, we focus first on B.H. and K.M.'s burden to show a likelihood of success on the merits. *Id.*

**III.**

The School District defends the bracelet ban as an exercise of its authority to restrict lewd, vulgar, profane, or plainly offensive student speech under *Fraser*. As to the novel question of *Fraser*'s scope, jurists seem to agree on one thing: "[t]he mode of analysis employed in *Fraser* is not entirely clear." *Morse*, 551 U.S. at 404.[7]

---

[7] The rest of the Supreme Court's student-speech jurisprudence might fairly be described as opaque. *See Morse*, 551 U.S. at 418 (Thomas, J., concurring) ("I am afraid that our jurisprudence now says that students have

16

On this point, we think the Supreme Court's student-speech cases are more consistent than they may first appear. As we explain, *Fraser* involved only *plainly* lewd speech. We hold that, under *Fraser*, a school may also categorically restrict speech that—although not *plainly* lewd, vulgar, or profane—could be interpreted by a reasonable observer as lewd, vulgar, or profane so long as it could not also plausibly be interpreted as commenting on a political or social issue. Because the "I ♥ boobies! (KEEP A BREAST)" bracelets are not plainly lewd and express support for a national breast-cancer-awareness campaign—unquestionably an important social issue—they may not be categorically restricted

a right to speak in schools except when they do not . . . ."); *id.* at 430 (Breyer, J., concurring in part and dissenting in part) ("[C]ourts have described the tests these cases suggest as complex and often difficult to apply."); *see, e.g.*, *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011) ("The law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges. The relevant Supreme Court cases can be hard to reconcile, and courts often struggle with which standard applies in any particular case."); *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 326, 331 (2d Cir. 2006) (acknowledging "some lack of clarity in the Supreme Court's student-speech cases" and stating that the "exact contours of what is plainly offensive [under *Fraser*] is not so clear").

17

under *Fraser*.

## A.     <u>The Supreme Court's decision in *Fraser*</u>

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). Of course, there are exceptions. When acting as sovereign, the government is empowered to impose time, place, and manner restrictions on speech, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), make reasonable, content-based decisions about what speech is allowed on government property that is not fully open to the public, *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674–75 (1998), decide what viewpoints to espouse in its own speech or speech that might be attributed to it, *see Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005), and categorically restrict unprotected speech, such as obscenity, *see Miller v. California*, 413 U.S. 15, 23 (1973).[8]

---

[8] Other examples of categorically unprotected speech include child pornography, *see New York v. Ferber*, 458 U.S. 747, 764–65 (1982), advocacy that imminently incites lawless action, *see Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) (per curiam), fighting words, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942), true threats, *see Watts v. United States*, 394 U.S.

Sometimes, however, the government acts in capacities that go beyond being sovereign. In those capacities, it not only retains its sovereign authority over speech but also gains additional flexibility to regulate speech. *See In re Kendall*, 712 F.3d 814, 825 (3d Cir. 2013) (collecting examples). One of those other capacities is K-12 educator. Although "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" the First Amendment has to be "applied in light of the special characteristics of the school environment" and thus students' rights to freedom of speech "are not automatically coextensive with the rights of adults in other settings." *Morse*, 551 U.S. at 396–97 (internal quotation marks and citations omitted).

The Supreme Court first expressed this principle nearly a half century ago. In 1965, the United States deployed over 200,000 troops to Vietnam as part of Operation Rolling Thunder—and thus began the Vietnam War. That war "divided this country as few other issues [e]ver have." *Tinker*, 393 U.S. at 524 (Black, J.,

---

705, 708 (1969) (per curiam), commercial speech that is false, misleading, or proposes illegal transactions, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562, 566–67 (1980), and some false statements of fact, *see United States v. Alvarez*, 132 S. Ct. 2537, 2546–47 (2012).

dissenting). Public opposition to the war made its way into schools, and in one high-profile case, a group of high-school and middle-school students wore black armbands to express their opposition. *Id.* at 504 (majority opinion). School officials adopted a policy prohibiting the armbands and suspending any student who refused to remove it when asked. *Id.* Some students refused and were suspended. *Id.* The Supreme Court upheld their right to wear the armbands. *Id.* at 514. *Tinker* held that school officials may not restrict student speech without a reasonable forecast that the speech would substantially disrupt the school environment or invade the rights of others. *Id.* at 513. As nothing more than the "silent, passive expression of opinion, unaccompanied by any disorder or disturbance on [the students'] part," the students' armbands were protected by the First Amendment. *Id.* at 508.

Under *Tinker*'s "general rule," the government may restrict school speech that threatens a specific and substantial disruption to the school environment or that "inva[des] . . . the rights of others."[9] *Saxe v. State*

---

[9] We have not yet decided whether *Tinker* is limited to on-campus speech. *See J.S. v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 & n.3 (3d Cir. 2011) (en banc) (declining to reach this issue); *see also id.* at 936 (Smith, J., concurring) ("I write separately to address a question

20

*College Area Sch. Dist.*, 240 F.3d 200, 211, 214 (3d Cir. 2001) (citing *Tinker*, 393 U.S. at 504). Since *Tinker*, the Supreme Court has identified three "narrow" circumstances in which the government may restrict student speech even when there is no risk of substantial disruption or invasion of others' rights. *Id.* at 212. First, the government may categorically restrict vulgar, lewd, profane, or plainly offensive speech in schools, even if it would not be obscene outside of school. *Fraser*, 478 U.S. at 683, 685. Second, the government may likewise restrict speech that "a reasonable observer would interpret as advocating illegal drug use" and that cannot "plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422 (Alito, J., concurring); *see also id.* at 403 (majority opinion) ("[T]his is plainly not a case about political debate over the criminalization of drug use or possession.").[10] And third, the government may impose restrictions on school-sponsored speech that are "reasonably related to legitimate pedagogical concerns"—a power usually lumped together with the other school-specific speech doctrines but that, strictly speaking, simply reflects the government's more general power as sovereign over

---

that the majority opinion expressly leaves open: whether *Tinker* applies to off-campus speech in the first place.").

[10] As we explain in Part III.B(2), the limitations that Justice Alito's concurrence places on the majority's opinion in *Morse* are controlling.

21

government-sponsored speech.[11] *Hazelwood Sch. Dist. v.*

---

[11] *Compare Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) (discussing the government-speech doctrine and explaining that "[a] government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message" (citing *Johanns*, 544 U.S. at 562)), *with Kuhlmeier*, 484 U.S. at 271, 273 (reaffirming the government's same authority to control speech that might be "reasonably perceive[ed] to bear the imprimatur of the school" in its role as K-12 educator); *see also* Eugene Volokh, *The First Amendment and the Government as K-12 Educator*, The Volokh Conspiracy (Oct. 31, 2011, 6:26 PM), http://www.volokh.com/2011/10/31/the-first-amendment-and-the-government-as-k-12-educator/ ("[*Kuhlmeier*] generally reflects broad government-as-speaker law, and not special rules related to the government as K-12 educator."); Michael J. O'Connor, Comment, *School Speech in the Internet Age: Do Students Shed Their Rights When They Pick Up a Mouse?*, 11 U. Pa. J. Const. L. 459, 469 (2009) ("Hazelwood . . . simply illustrates the idea that the school speech arena is not isolated from developments in wider First Amendment jurisprudence. . . . Hazelwood recognizes that schools are government actors and therefore are entitled to control speech that could be reasonably viewed as originating with them."); Gia B.

*Kuhlmeier*, 484 U.S. 260, 273 (1988).

The first exception is at issue here. We must determine the scope of the government's authority to categorically restrict vulgar, lewd, indecent, or plainly offensive speech under *Fraser*. *Fraser* involved a high-school assembly during which a student "nominated a peer for class office through an 'an elaborate, graphic, and explicit sexual metaphor.'" *Saxe*, 240 F.3d at 212 (quoting *Fraser*, 478 U.S. at 677). Fraser's speech "glorif[ied] male sexuality":

> I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm. . .. Jeff Kuhlman [the candidate] is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts, he drives hard, pushing and pushing until finally—he succeeds. . . . Jeff is a man who will go to the very end—even the climax, for each and every one of you. . . . So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can

Lee, *First Amendment Enforcement in Government Institutions and Programs*, 56 UCLA L. Rev. 1691, 1711–12 (2009) (similar).

be.

*Fraser*, 478 U.S. at 687 (Brennan, J., concurring). In response, "[s]ome students hooted and yelled; some by gestures simulated the sexual activities pointedly alluded to in [Fraser's] speech." *Id.* at 678 (majority opinion). Still "[o]ther students appeared to be bewildered and embarrassed by the speech." *Id.* The school suspended Fraser and took him out of the running for graduation speaker. *Id.*

The Supreme Court upheld Fraser's suspension. *Id.* at 683. Rather than requiring a reasonable forecast of substantial disruption under *Tinker*, the Court held that lewd, vulgar, indecent, and plainly offensive student speech is categorically unprotected in school, even if it falls short of obscenity and would have been protected outside school. *Saxe*, 240 F.3d at 213 (discussing *Fraser*); *Morse*, 551 U.S. at 405 ("Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected."); *Fraser*, 478 U.S. at 688 (Blackmun, J., concurring) ("If [Fraser] had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate."). For this proposition, the Court relied on precedent holding that the government can restrict expression that would be obscene from a minor's perspective—even though it would not be obscene in an

24

adult's view—where minors are either a captive audience or the intended recipients of the speech. *See Fraser*, 478 U.S. at 684–85 (relying on *Ginsberg v. New York*, 390 U.S. 629, 635–37 & nn.4–5 (1968) (upholding criminal punishment for selling to minors any picture depicting nudity); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982) (plurality opinion) (acknowledging that the Free Speech Clause would allow a local board of education to remove "pervasively vulgar" books from school libraries); and *FCC v. Pacifica Found.*, 438 U.S. 726, 749–50 (1978) (rejecting a Free Speech Clause challenge to the FCC's broad leeway to regulate indecent-but-not-obscene material on broadcast television during hours when children were likely to watch)).

*Fraser* did no more than extend these obscenity-to-minors[12] cases to another place where minors are a

---

[12] *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2735 (2011) (describing *Ginsberg* as regulating "obscenity for minors"); *Reno v. ACLU*, 521 U.S. 844, 869 (1997) (reaffirming the government's power under *Pacifica* and *Ginsberg* to "'protect[] the physical and psychological well-being of minors' which extended to shield them from indecent messages that are not obscene by adult standards" (quoting *Sable Comm'cns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989))); *Pacifica Found.*, 438 U.S. at 767 (Brennan, J., dissenting)

captive audience—schools. Indeed, as the Court explained, schools are tasked with more than just "educating our youth" about "books, the curriculum, and the civics class." *Id.* at 681. Society also expects schools to "teach[] students the boundaries of socially appropriate behavior," including the "fundamental values of 'habits and manners of civility' essential to a democratic society." *Id.* at 681, 683 (citation omitted). Consequently, Fraser's "sexually explicit monologue" was not protected. *Id.* at 685.

It is important to recognize what was not at stake in *Fraser*. *Fraser* addressed only a school's power over speech that was plainly lewd—not speech that a reasonable observer could interpret as either lewd or non-lewd. *See, e.g.*, *Doninger v. Niehoff*, 527 F.3d 41, 49 (2d Cir. 2008) ("[*Fraser*'s] reference to 'plainly offensive' speech must be understood in light of the vulgar, lewd, and sexually explicit language that was at issue in [that] case."); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d

---

(agreeing with the majority that the government could regulate "variable obscenity" or "obscenity to minors" on broadcast television, but disagreeing with the majority that the Carlin monologue met that standard); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 n.10 (1975) (describing *Ginsberg* as involving "obscenity as to minors"); *Ginsberg*, 390 U.S. at 635 n.4 (using the label "variable obscenity").

26

524, 530 (9th Cir. 1992) (interpreting *Fraser* as limited to "per se vulgar, lewd, obscene, or plainly offensive" school speech).  After all, the Court believed Fraser's speech to be "plainly offensive to both teachers and students—indeed to any mature person."[13]  *Fraser*, 478 U.S. at 683.

And because it was plainly lewd, the Court did not believe that Fraser's speech could plausibly be interpreted as political or social commentary.  In hindsight, it might be tempting to believe that Fraser's speech was political because it was made in the context of a student election.  *Cf. Citizens United v. FEC*, 558 U.S. 310, 130 S. Ct. 876, 898 (2010) (describing the importance of political speech as the "means to hold

---

[13] Of course, Fraser's speech might "seem[] distinctly lacking in shock value" today, especially "from the perspective enabled by 25 years of erosion of refinement in the use of language."  *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011); *see also Fraser*, 478 U.S. at 691 (Stevens, J., dissenting) (noting that Clark Gable's famous use of the word "damn" in "Frankly, my dear, I don't give a damn" "shocked the Nation" when Justice Stevens was a high school student but had become "less offensive" by the time of *Fraser*).  Any such change in perspective, however, is irrelevant to our examination of the Court's interpretation of Fraser's speech and its reasoning.

27

officials accountable to the people"). But that kind of revisionist history is belied by both the logic and language of *Fraser*. "*Fraser* permits a school to prohibit words that 'offend for the same reasons that obscenity offends.'" *Saxe*, 240 F.3d at 213 (quoting *Fraser*, 478 U.S. at 685). Obscenity, in turn, offends because it is "no essential part of any exposition of ideas, and [is] of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *Fraser*, 478 U.S. at 683 (quoting *Pacifica Found.*, 438 U.S. at 746 (plurality opinion)). In other words, obscenity and obscenity to minors, like "other historically unprotected categories of speech," have little or no political or social value. *United States v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 1585 (2010). By concluding that Fraser's speech met the obscenity-to-minors standard, the Court necessarily implied that his speech could not be interpreted as having "serious" political value. *Miller*, 413 U.S. at 24.

In fact, the majority in *Fraser* made this explicit. "[T]he *Fraser* [C]ourt distinguished its holding from *Tinker* in part on the absence of any political message in Fraser's speech." *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 326, 328 (2d Cir. 2006). In the Court's own words, there was a "marked distinction between the *political* 'message' of the armbands in *Tinker* and the *sexual* content of [Fraser's] speech." *Fraser*, 478 U.S. at

28

680 (emphasis added); *see also Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 332 (6th Cir. 2010) ("*Tinker* governs this case because by wearing clothing bearing images of the Confederate flag, Tom Defoe engaged in 'pure speech,' which is protected by the First Amendment, and thus *Fraser* would not apply."). Several courts of appeals have similarly interpreted *Fraser*. *Guiles*, 461 F.3d at 326, 328; *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 256 (4th Cir. 2003) (explaining that *Fraser* "distinguish[ed] *Tinker* on the basis that the lewd, vulgar, and plainly offensive speech was 'unrelated to any political viewpoint' (quoting *Fraser*, 478 U.S. at 685)); *Chandler*, 978 F.2d at 532 n.2 (Goodwin, J., concurring) (concluding that *Fraser* does not apply because "this case clearly involves political speech"). And the Supreme Court later characterized *Fraser*'s reasoning the same way. *Morse*, 551 U.S. at 404 (noting that *Fraser* was "plainly attuned" to the sexual, non-political "content of Fraser's speech"). In fact, *Morse* refused to "stretch[] *Fraser*" so far as to "encompass any speech that could fit under some definition of 'offensive'" out of a fear that "much political and religious speech might be perceived as offensive to some." *Id.* at 409. *Fraser* therefore involved plainly lewd speech that did not comment on political or social issues.

**B.     How far does a school's authority under *Fraser* extend?**

The School District asks us to extend *Fraser* in at least two ways: to reach speech that is ambiguously lewd, vulgar, or profane and to reach speech on political or social issues.[14]  The first step is justified, but the second

---

[14] *Fraser* differs from this case in a third way: *Fraser* involved speech at an official school assembly, whereas the School District's bracelet ban extends to the entire school day, not just school-sponsored functions.  But like other courts of appeals, we do not think that this difference matters.  *See, e.g.*, *R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 542 (2d Cir. 2011) ("[W]e have not interpreted *Fraser* as limited either to regulation of school-sponsored speech or to the spoken word."); *Chandler*, 978 F.2d at 529 (concluding that restriction of vulgar, lewd, and plainly offensive speech under *Fraser* is not limited to speech "given at an official school assembly"); *Bystrom by and through Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 753 (8th Cir. 1987) ("It is true that [*Fraser*] involved a speech given before a student assembly . . . . [But] [t]his possible difference, in our view, does not amount to a legal distinction making the *Bethel* rule inapplicable here.").  As we explained, *Fraser* reflected an extension of the Court's obscenity-to-minors jurisprudence, which permits the government to restrict

30

lewd speech to children where children are either a captive audience or the intended recipients of the speech. Children are just as much of a captive audience in the hallways, cafeteria, or locker rooms as they are in official school assemblies and classrooms. Naturally, then, we have never described a school's authority under *Fraser* as being limited to official school functions and classrooms. *See, e.g.*, *J.S.*, 650 F.3d at 927 ("The first exception is set out in *Fraser*, which we interpreted to permit school officials to regulate "'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech *in school*." (emphasis in original) (quoting *Saxe*, 240 F.3d at 213)). Although Justice Brennan's concurrence and Justice Stevens's dissent in *Fraser* suggested that this difference might matter, nothing in the majority opinion endorsed their distinction. *See Fraser*, 478 U.S. at 689 (Brennan, J., concurring) (opining that Fraser's "speech may well have been protected had he given it in school but under different circumstances, where the school's legitimate interests in teaching and maintaining civil public discourse were less weighty"); *id.* at 696 (Stevens, J., dissenting) ("It seems fairly obvious that [Fraser's] speech would be inappropriate in certain classroom and formal social settings. On the other hand, in a locker room or perhaps in a school corridor the metaphor in the speech might be regarded as rather routine comment."). Indeed, if *Fraser* were so limited, then a school's authority under *Fraser* would largely merge with its

31

is not.

**1. Under *Fraser*, schools may restrict ambiguously lewd speech only if it cannot plausibly be interpreted as commenting on a social or political matter.**

Although *Fraser* involved plainly lewd, vulgar, profane, or offensive speech that "offends for the same reasons obscenity offends," *Saxe*, 240 F.3d at 213 (quoting *Fraser*, 478 U.S. at 685), student speech need not rise to that level to be restricted under *Fraser*. We conclude that schools may also categorically restrict ambiguous speech that a reasonable observer could interpret as lewd, vulgar, profane, or offensive—unless, as explained below, the speech could also plausibly be interpreted as commenting on a political or social issue. After all, *Fraser* made clear that "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." 478 U.S. at 683. The Supreme Court's three other student-speech cases suggest that courts should defer to a school's decisions to restrict what a reasonable observer would interpret as lewd, vulgar, profane, or offensive. *See Morse*, 551 U.S. at 403 (explaining that,

_____

power to reasonably regulate school-sponsored speech under *Kuhlmeier*, yet we have always viewed *Fraser* and *Kuhlmeier* as separate exceptions to *Tinker*. *See, e.g.*, *J.S.*, 650 F.3d at 927.

32

under *Tinker*, courts determine whether school officials have "reasonably conclude[d]" that student speech will substantially disrupt the school); *id.* at 405 (explaining that, under *Kuhlmeier*, courts uphold a school's reasonable, pedagogically related restrictions on speech that an observer could reasonably attribute to the school); *id.* at 422 (Alito, J., concurring) (explaining that schools may restrict student speech that could "reasonably be regarded as encouraging illegal drug use" and that could not plausibly be interpreted as commenting on a political or social issue). This makes sense. School officials know the age, maturity, and other characteristics of their students far better than judges do. Our review is restricted to a cold and distant record. And we must take into account that these same officials must often act "suddenly and unexpectedly" based on their experience. *Id.* at 409–10 (majority opinion); *see, e.g.*, *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416–17 (3d Cir. 2003) ("There can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students. Human sexuality provides the most obvious example of age-sensitive matter . . . ." (citing *Fraser*, 478 U.S. at 683–84)); *Sypniewski*, 306 F.3d at 266 ("What is necessary in one school at one time will not be necessary elsewhere and at other times.").

It remains the job of judges, nonetheless, to determine whether a reasonable observer could interpret

33

student speech as lewd, profane, vulgar, or offensive. *See Morse*, 551 U.S. at 402 (taking the same approach with respect to the message of drug advocacy on Frederick's banner); *see also Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 130 S. Ct. 2971, 2988 (2010) ("This Court is the final arbiter of the question whether a public university has exceeded constitutional constraints, and we owe no deference to universities when we consider that question."). Whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive depends on the plausibility of the school's interpretation in light of competing meanings; the context, content, and form of the speech; and the age and maturity of the students. *See, e.g.*, *Chandler*, 978 F.2d at 530 (analyzing the word "scab" on buttons worn by students during a teacher strike to determine whether it was a vulgar, offensive epithet or just "common parlance" and concluding that, at the motion-to-dismiss stage, *Fraser* did not apply).

Although this is a highly contextual inquiry, several rules apply. A reasonable observer would not adopt an acontextual interpretation, and the subjective intent of the speaker is irrelevant. *See Morse*, 551 U.S. at 401–02 (explaining that Frederick's desire to appear on television "was a description of [his] *motive* for displaying the banner" and "not an interpretation of what the banner sa[id]"); *see also Saxe*, 240 F.3d at 216–17 (noting that students' intent to offend or disrupt does not

34

satisfy *Tinker*). And *Fraser* is not a blank check to categorically restrict any speech that touches on sex or any speech that has the potential to offend. *See Morse*, 551 U.S. at 401, 409 (refusing to "stretch[] *Fraser*" so far as "to encompass any speech that could fit under some definition of 'offensive' and rejecting the argument that the "BONG HiTS 4 JESUS" message on Frederick's banner could be banned under *Fraser*, even though it "is no doubt offensive to some""); *accord* Eugene Volokh, *May 'Jesus Is Not a Homophobe' T-shirt Be Banned From Public High School As 'Indecent' And 'Sexual'?*, The Volokh Conspiracy (Apr. 4, 2012, 3:36 PM), http://www.volokh.com/2012/04/04/may-jesus-was-not-a-homophobe-T-shirt-be-banned-from-public-high-school-as-indecent-and-sexual/ ("But *Fraser* . . . hardly suggested that all speech on political and religious questions related to sexuality and sexual orientation could be banned from public high school."). After all, a school's mission to mold students into citizens capable of engaging in civil discourse includes teaching students of sufficient age and maturity how to navigate debates touching on sex.

**2. *Fraser* does not permit a school to restrict ambiguously lewd speech that can also plausibly be interpreted as commenting on a social or political issue.**

A school's leeway to categorically restrict ambiguously lewd speech, however, ends when that speech could also plausibly be interpreted as expressing a view on a political or social issue. Justices Alito and Kennedy's concurrence in *Morse* adopted a similar protection for political speech that could be interpreted as illegal drug advocacy. Their narrower rationale protecting political speech limits and controls the majority opinion in *Morse*, and it applies with even greater force to ambiguously lewd speech.

Justice Alito's concurrence, joined by Justice Kennedy, provided the crucial fourth and fifth votes in the five-to-four majority opinion. But the two justices conditioned their votes on the "understanding that (1) [the majority opinion] goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (2) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422 (Alito, J., concurring); *see id.* at 425 (regarding the categorical regulation of *non-political* advocacy of ambiguous illegal drug advocacy "as standing at the far

36

reaches of what the First Amendment permits" and "join[ing] the opinion of the Court with the understanding that the opinion does not endorse any further extension"). The purpose of Justice Alito's concurrence was to "ensur[e] that political speech will remain protected within the school setting" (subject, as always, to *Tinker*'s substantial-disruption principle). *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007).

Because the votes of Justices Alito and Kennedy were necessary to the majority opinion and were expressly conditioned on their narrower understanding that speech plausibly interpreted as political or social commentary was protected from categorical regulation, that limitation is a binding part of *Morse*. This conclusion requires a minor detour. The most familiar situation in which we follow the narrowest rationale was expressed t by the Supreme Court in *Marks v. United States*: when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (internal quotation marks and citations omitted). But that situation is not the only one in which we tally the justices' views and look for the narrowest rationale. The Supreme Court and this Court have both applied the narrowest-grounds approach in circumstances beyond those posed by *Marks*,

37

including to determine holdings in majority opinions (not just plurality opinions involving "no single legal rationale explain[ing] the result") [15] and to count even dissenting justices' votes that, by definition, could not "explain the result" (not just the votes of those who "concurred in the judgments").[16] *See United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006) (noting that the Supreme Court has "moved away" from adhering to the strict circumstances in *Marks*).

And it makes sense that the limitations in Justice Alito's concurrence would narrow the majority opinion. When an individual justice's vote is not needed to form a majority, "the meaning of a majority opinion is to be found within the opinion itself" because "the gloss that an individual [j]ustice chooses to place upon it is not authoritative." *McKoy v. North Carolina*, 494 U.S. 433,

---

[15] *See* discussion of *Horn* and *Bishop infra* pp. 30–33.

[16] *See, e.g.*, *Nichols v. United States*, 511 U.S. 738, 746 (1994) (combining the views of four dissenters and Justice Stewart in *Baldasar v. Illinois*, 446 U.S. 222 (1980), to form a "holding"); *Donovan*, 661 F.3d at 182 ("[W]e have looked to the votes of dissenting Justices if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue."); *Student Pub. Interest Research Grp. of N.J., Inc. v. AT&T Bell Labs.*, 842 F.2d 1436, 1451 & n.16 (3d Cir. 1988) (same).

448 n.3 (1990) (Blackmun, J., concurring). But when an individual justice joins the majority and is essential to maintaining the majority, and then writes separately, "the opinion is *not* a majority opinion except to the extent that it accords with his views." *Id.* at 462 n.3 (Scalia, J., dissenting). Of course, that linchpin justice's opinion "cannot add to what the majority opinion holds" by "binding the other four [j]ustices to what they have not said" because his views would not be the narrowest grounds. *Id.* But that justice's separate opinion "can assuredly narrow what the majority opinion holds, by explaining the more limited interpretation adopted by that necessary member of the majority." *Id.* In that case, the linchpin justice's views are "the least common denominator" necessary to maintain a majority opinion. *Id.*; *see generally* Sonja R. West, *Concurring in Part and Concurring in the Confusion*, 104 Mich. L. Rev. 1951 (2006) (advocating the same approach and explaining that it is consistent with determining precedent from the traditional Supreme Court's seriatim opinions).

Indeed, this is not the first time that we have been compelled to limit a majority opinion by a linchpin justice's narrower concurrence. In *Horn v. Thoratec*, we considered whether the federal regulation of medical devices preempts only state-law "requirement[s]" specific to medical devices or also preempts general common-law claims not specific to medical devices (such as negligence). *See* 376 F.3d 163, 173–74 (3d Cir. 2004).

39

That, in turn, required us to analyze the Supreme Court's decision in *Medtronic v. Lohr*, 518 U.S. 470 (1996). We read Part V of the *Lohr* majority opinion—which Justice Breyer formally joined as the fifth vote—as saying that only device-specific state-law requirements, not general common-law claims, are preempted. *See Horn*, 376 F.3d at 174 (noting that the majority in Part V conclud[ed] that common-law claims "escape[]" preemption because "their generality leaves them outside" of the preempted category of device-specific requirements (quoting *Lohr*, 518 U.S. at 502)); *id.* at 175 (explaining that "Justice Breyer joined in some parts of Justice Stevens' plurality opinion (thus making it a majority opinion at times)," including "in Part V"). But we also read Justice Breyer's concurrence as reaching the opposite conclusion, despite his having joined that portion of the majority opinion. *See id.* Faced with an apparent conflict between Part V of the majority opinion and Justice Breyer's concurrence, we followed the latter because it was narrower, just as the Fifth, Sixth, Seventh, Eighth, and Ninth Circuits had done. *Id.* at 175–76; *see also Martin v. Medtronic*, 254 F.3d 573, 581–83 (5th Cir. 2001); *Kemp v. Medtronic*, 231 F.3d 216, 230 (6th Cir. 2000); *Mitchell v. Collagen Corp.*, 126 F.3d 902, 911–12 (7th Cir. 1997); *Papike v. Tambrands, Inc.*, 107 F.3d 737, 742 (9th Cir. 1997). In doing so, we rejected our dissenting colleague's argument that the narrowest-grounds approach was "simply inapplicable" because Justice Breyer joined Part V of the majority opinion and that the "correct course of

40

action" in the event of a conflict "would be to follow Part V as the majority opinion." *Horn*, 376 F.3d at 184 & n.30 (Fuentes, J., dissenting); *see id.* at 183 (explaining that the *Horn* majority and the Seventh and Ninth Circuits "also perceived a contradiction and chose to ignore Justice Breyer's vote for Part V, instead crediting the apparently contrary reasoning in his concurrence").

Likewise, in *United States v. Bishop*, 66 F.3d 569, 576–77 (3d Cir. 1995), we relied on the narrower concurring views of Justices Kennedy and O'Connor to limit the majority's opinion in *United States v. Lopez*, 514 U.S. 549 (1995), which they formally joined as the fourth and fifth votes. We declined to read the majority opinion so broadly as to upend judicial deference to Congress's judgment about whether an activity substantially implicates interstate commerce, instead following the concurrence's view that the majority had reached a "necessary though limited holding" that still "counseled great restraint" before finding that Congress had transgressed its Commerce Clause power. *Bishop*, 66 F.3d at 590 (quoting *Lopez*, 514 U.S. at 568 (Kennedy, J., concurring)). As in *Horn*, we took that approach notwithstanding our dissenting colleague's argument that we should follow the breadth of the majority opinion and ignore the narrower concurrence because "Justices O'Connor and Kennedy *joined* in the [majority] opinion." *Id.* at 591 (Becker, J., concurring in part and dissenting in part). As even our dissenting

41

colleague explained, we followed the narrower views of Justices O'Connor and Kennedy because they "form[ed] an intermediate bloc [of the majority] which would view *Lopez* as case-specific." *Id.* And *Horn* and *Bishop* are not the only examples. *See, e.g.*, *United States v. Monclavo-Cruz*, 662 F.2d 1285, 1288 (9th Cir. 1981) (relying on the narrowing construction given to the majority opinion by Justice Powell, who was also a necessary member of the majority, to limit the majority's holding in *South Dakota v. Opperman*, 428 U.S. 364 (1976)); *United States v. Wilson*, 636 F.2d 1161, 1164 (8th Cir. 1980) (similar).

To be sure, the Supreme Court once said—in a case not involving a linchpin concurrence—that federal courts should not give "much precedential weight" to a concurring opinion, even if it coheres with the majority opinion. *Alexander v. Sandoval*, 532 U.S. 275, 285 n.5 (2001); *see also Vasquez v. Hillery*, 474 U.S. 254, 622 n.4 (1986) (describing the *Marks* rule as "inapplicable" to an opinion "to which five Justices expressly subscribed"). Yet we have already decided that this principle from *Alexander* is inapplicable to a concurrence that (1) "cast the so-called 'swing vote,' which was crucial to the outcome of the case and without which there could be no majority," and (2) took a narrower approach than the majority opinion. *Horn*, 376 F.3d at 174–75 (distinguishing *Alexander* on this basis).

42

Which brings us back to Justice Alito's concurrence in *Morse*. The linchpin justices in *Morse*—Justices Alito and Kennedy—expressly conditioned their joining the majority opinion on a narrower interpretation of the opinion—namely, that it did not permit the restriction of speech that could plausibly be interpreted as political or social speech. Had they known that lower courts would ignore their narrower understanding of the majority opinion—or had the majority opinion expressly gone farther than their limitations—then, by their own admission, they would not have joined the majority opinion. That would have transformed the five-justice majority opinion into a three-justice plurality opinion, with their concurring views becoming the controlling narrowest grounds under an uncontroversial application of the *Marks* doctrine. Why, then, should it matter whether they formally joined the majority opinion or not?

It should not. Ignoring limitations placed on the majority opinion by a necessary member of the majority would mean that four justices could "fabricate a majority by binding a fifth to their interpretation of what they say, even though he writes separately to explain his own more narrow understanding." *McKoy*, 494 U.S. at 462 n.3 (Scalia, J., dissenting). That produces inexplicable anomalies. If a four-justice plurality holds X and Y, and a fifth justice "concurs in the judgment" to hold only X and rejects Y, the fifth member's more limited views become binding under a straightforward application of

43

*Marks*.  The same interpretation is true if the fifth justice joins the majority opinion and "concurs in part."  Yet if the same concurring justice joins the majority opinion while "concurring," then the majority opinion holding X and Y becomes binding and the fifth member's narrower views evaporate.  Such an approach places all of its weight on the distinction between a justice's choice to follow his name with "concurring" instead of "concurring in part" or "concurring in the judgment."  *Cf.* West, *Concurring in Part and Concurring in the Confusion*, 104 Mich. L. Rev. at 1953–54 (explaining why these "after the comma" phrases cannot bear such weight); Tristan C. Pelham-Webb, Note, *Powelling for Precedent: "Binding" Concurrences*, 64 N.Y.U. Ann. Surv. Am. L. 693, 737 (2009) (same).  That elevates formalism over substance at the expense of ignoring the very conditions on which a necessary member of the majority expressly chose to join the majority.

In short, because Justice Alito's concurrence provides "a single legal standard . . . [that] when properly applied, produce[s] results with which a majority of the Justices in the case articulating the standard would agree," *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (alterations in original) (internal quotation marks and citations omitted), his opinion in *Morse* forms the "narrowest grounds necessary to secure a majority," *Planned Parenthood of Se. Pa. v. Casey*, 947 F.2d 682, 694 n.7 (3d Cir. 1991), *aff'd in part and rev'd in part on*

44

*other grounds*, 505 U.S. 833 (1992). As a result, we agree with the en banc Fifth Circuit that the limitations placed on the majority opinion by Justice Alito's concurrence are binding on us.[17] *See Morgan v. Swanson*, 659 F.3d 359, 403 (5th Cir. 2011) (en banc) (majority opinion of Elrod, J.) (describing Justice Alito's *Morse* concurrence as "controlling"); *see also Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 746 n.25 (5th Cir. 2009) ("We have held Justice Alito's concurrence to be the controlling opinion in Morse." (citing *Ponce*, 508 F.3d at 768)).

---

[17] We have had this same intuition previously. *See J.S.*, 650 F.3d at 927 ("Notably, Justice Alito's concurrence in *Morse* further emphasizes the narrowness of the Court's holding."). And every court of appeals to address this question (other than the Seventh Circuit) has shared our intuition. *See Morgan*, 589 F.3d at 746 n.25; *Barr v. Lafon*, 538 F.3d 554, 564 (6th Cir. 2008) (treating Justice Alito's concurrence as the basis for *Morse*'s "narrow holding"); *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1228 (10th Cir. 2009) (same). The Seventh Circuit concluded, without citation or support, that the narrowest-grounds approachdoes not apply where there is a majority opinion, as in *Morse.Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204*, 523 F.3d 668, 673 (7th Cir. 2008). But as we explain, we have already rejected the Seventh Circuit's formalist approach when it was urged by dissenting colleagues in *Horn* and *Bishop*.

Justice Alito would have protected political or social speech reasonably interpreted to advocate illegal drug use, and that protection applies even more strongly to ambiguously lewd speech. In *Morse*, the Court added a new categorical exception to *Tinker*: student speech that a reasonable observer could interpret as advocating illegal drug use but that cannot plausibly be interpreted as addressing political or social issues. *Id.* at 422. The exception was justified because illegal drugs pose an "immediately obvious," "grave" and "unique threat to the physical safety of students." *Id.* at 425. Despite that threat, however, the Court held that speech advocating illegal drug use is not categorically unprotected if it "can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as the wisdom of the war on drugs or of legalizing marijuana for medicinal use." *Id.* at 422 (internal quotation marks omitted). Even with that limitation, the Court made clear that this new exception to *Tinker* "stand[s] at the far reaches of what the First Amendment permits." *Id.* at 425.

If speech posing such a "grave" and "unique threat to the physical safety of students" can be categorically regulated only when it cannot "plausibly be interpreted as commenting on any political or social issue"—and that regulation nonetheless "stand[s] at the far reaches of what the First Amendment permits"—then there is no reason why ambiguously lewd speech should receive any

46

less protection when it also "can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422, 425. One need not be a philosopher of Mill or Feinberg's stature[18] to recognize that harmful speech posing an "immediately obvious" threat to the "physical safety of students," *id.* at 425, presents a far graver threat to the educational mission of schools—thereby warranting less protection—than ambiguously lewd speech that might undercut teaching "the appropriate form of civil discourse" to students, *Fraser*, 478 U.S. at 683. It would make no sense to afford a T-shirt exclaiming "I ♥ pot! (LEGALIZE IT)" protection under *Morse* while declaring that a bracelet saying "I ♥ boobies! (KEEP A BREAST)" is unprotected under *Fraser*.

Those limits are persuasive on their own terms, even if we disregard the controlling limitations of Justice Alito's *Morse* concurrence. *Fraser* reflects the longstanding notions that "not all speech is of equal First

---

[18] John Stuart Mill and Joel Feinberg are both known for, among other things, their groundbreaking work on the relationship between harm and offense and how conduct of each type might be subject to criminalization. *See generally* Joel Feinberg, *Harm to Others: The Moral Limits of the Criminal Law* (1984); Joel Feinberg, *Offense to Others: The Moral Limits of the Criminal Law* (1985); John Stuart Mill, *On Liberty* (1859).

Amendment importance" and that "speech on matters of public concern . . . is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (quotation marks and citations omitted); *see also Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." (internal quotation marks and citations omitted)). And it is only a limited exception to the otherwise "bedrock principle" of the First Amendment that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989); *see also Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment."). The Supreme Court has never held that schools may bore willy-nilly through that bedrock principle. But it has made clear that "minors are entitled to a significant measure of First Amendment protection" and the government does not "have a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2736 (2011). To be sure, *Fraser* rejected the idea that "simply because an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school." *Fraser*, 478 U.S. at 682. As we have explained, though, *Fraser* was

48

limited to plainly lewd speech, and that refusal to protect a student's plainly lewd speech where the same speech by an adult would be protected does not extend to political speech that is not plainly lewd. On that score, our conclusion puts us in good company with five justices in *Morse*[19] who were expressly unwilling to permit a categorical exception to *Tinker* that would intrude on political or social speech and two justices[20]

---

[19] In addition to Justices Alito and Kennedy, three dissenting justices (Justices Stevens, Souter, and Ginsburg) would not have extended the *Morse* exception to political or social speech. These five justices instead split over whether Morse's speech could reasonably be interpreted as advocating illegal drug use. *Morse*, 551 U.S. at 444, 448 (Stevens, J., dissenting) (concluding that Morse's banner is constitutionally protected because it could not reasonably be interpreted as advocating illegal drug use and was at most a "minority[] viewpoint" in "the national debate about a serious issue" deserving First Amendment protection).

[20] In the majority opinion, Chief Justice Roberts and Justice Scalia refused to "stretch[] *Fraser*" so far as to "encompass any speech that could fit under some definition of 'offensive'" specifically to protect "political and religious speech [that] might be perceived as offensive to some." *Morse*, 551 U.S. at 409; *see also id.* at 403 (majority opinion) ("But not even Frederick argues that the banner conveys any sort of political or

who all but said as much.

What's more, this limitation is consistent with our previous intuitions as well as those of the Sixth and Second Circuits. *See Saxe*, 240 F.3d at 213 (Alito, J.) (noting that the "dichotomy" between *Fraser* and *Tinker* is "neatly illustrated by the comparison between Cohen's ["Fuck the Draft"] jacket and Tinker's armband"); *Defoe*, 625 F.3d at 335 n.6 (rejecting the Eleventh Circuit's extension of *Fraser* to displays of the Confederate flag and instead holding that such displays "by students [are] protected political speech that school officials may only regulate by satisfying the *Tinker* standard" (citing *Barr v. Lefon*, 538 F.3d. 554, 569 n.7 (6th Cir. 2008))); *Guiles*,

religious message. Contrary to the dissent's suggestion, this is plainly not a case about political debate over the criminalization of drug use or possession."); *id.* at 406 n.2 ("[T]here is no serious argument that Frederick's banner is political speech . . . ."). Although Justice Thomas joined that portion of the majority opinion, he would have concluded that "the First Amendment, as originally understood, does not protect student speech in public schools" and overruled *Tinker*. *Id.* at 410–11 (Thomas, J., concurring). Justice Breyer would have avoided the "difficult First Amendment issue" and concluded that "qualified immunity bars [Morse's] claim for monetary damages." *Id.* at 425 (Breyer, J., concurring in the judgment in part and dissenting in part).

461 F.3d at 325 (holding *Fraser* inapplicable because the T-shirt was not "as plainly offensive as the sexually charged speech considered in *Fraser* . . . [,] especially when considering that [it was] part of an anti-drug political message").

Consequently, we hold that the *Fraser* exception does not permit ambiguously lewd speech to be categorically restricted if it can plausibly be interpreted as political or social speech.

**3. Under *Fraser*, schools may restrict plainly lewd speech regardless of whether it could plausibly be interpreted as social or political commentary.**

As the Supreme Court made clear in *Fraser*, though, schools may restrict plainly lewd speech regardless of whether it could plausibly be interpreted to comment on a political or social issue. *Fraser*, 478 U.S. at 682 ("[T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's ["Fuck the Draft"] jacket."). That is true by definition. Plainly lewd speech "offends for the same reasons obscenity offends" because the speech in that category is "no essential part of any exposition of ideas" and thus carries very "slight social value." *Id.* at 683 (quoting *Pacifica Found.*, 438 U.S. at 746 (plurality opinion)). As with obscenity in general, obscenity to minors, and all other historically unprotected categories

51

of speech, "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required" because "the balance of competing interests is clearly struck." *Stevens*, 130 S. Ct. at 1585–86 (quoting *New York v. Ferber*, 458 U.S. 747, 763–64 (1982)). In other words, we do not engage in a case-by-case determination of whether obscenity to minors—and by extension, plainly lewd speech under *Fraser*—carries social value. As a result, schools may continue to regulate plainly lewd, vulgar, profane, or offensive speech under *Fraser* even if a particular instance of such speech can "plausibly be interpreted as commenting on any political or social issue." *Morse*, 551 U.S. at 422 (Alito, J., concurring).

In response, the School District recites a mantra that has *Fraser* providing schools the ultimate discretion to define what is lewd and vulgar. It relies on the Supreme Court's sentiment that schools may define their "basic educational mission" and prohibit student speech that is inconsistent with that mission. *Kuhlmeier*, 484 U.S. at 266–67.[21] Indeed, before *Morse*, some courts of

---

[21] *See also Fraser*, 478 U.S. at 683 ("[T]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."); *Pico*, 457 U.S. at 864 ("[F]ederal courts should not ordinarily 'intervene in the resolution of conflicts

appeals adopted that broad interpretation of the Supreme Court's student-speech cases. *See, e.g.*, *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001) ("[A] school need not tolerate student speech that is inconsistent with its basic educational mission."); *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470 (6th Cir. 2000) ("[W]here Boroff's T-shirts contain symbols and words that promote values that are so patently contrary to the school's educational mission, the School has the authority, under the circumstances of this case, to prohibit those T-shirts [under *Fraser*].").

Whatever the face value of those sentiments, such sweeping and total deference to school officials is incompatible with the Supreme Court's teachings. In *Tinker*, *Hazelwood*, and *Morse*, the Supreme Court independently evaluated the meaning of the student's speech and the reasonableness of the school's

---

which arise in the daily operation of school systems.'" (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))); *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."); *see also Kuhlmeier*, 484 U.S. at 273 ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.").

53

interpretation and actions. There is no reason the school's authority under *Fraser* should receive special treatment. More importantly, such an approach would swallow the other student-speech cases, including *Tinker*, effectively eliminating judicial review of student-speech restrictions. *See Guiles*, 461 F.3d at 327 (making this point). That is precisely why the Supreme Court in *Morse* explicitly rejected total deference to school officials:

> The opinion of the Court does not endorse the broad argument advanced by petitioners and the United States that the First Amendment permits public school officials to censor any student speech that interferes with a school's "educational mission." . . . The "educational mission" argument would give public school authorities a license to suppress speech on political and social issues based on disagreement with the viewpoint expressed. The argument, therefore, strikes at the very heart of the First Amendment.

*Morse*, 551 U.S. at 423 (Alito, J., concurring).

Instead, *Morse* settled on a narrower view of deference, deferring to a school administrator's "reasonable judgment that Frederick's sign qualified as drug advocacy" only if the speech could not plausibly be interpreted as commenting on a political or social issue.

54

*Morse*, 551 U.S. at 441 (Stevens, J., dissenting); *see also id.* at 408 (majority opinion) ("[S]chools [may] restrict student expression that they reasonably regard as promoting illegal drug use."); *id.* at 422 (Alito, J., concurring) ("[A] public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use . . . ."). Our approach to lewd speech provides the same degree of deference to schools as the Court did in *Morse*. We defer to a school's reasonable judgment that an observer could interpret ambiguous speech as lewd, vulgar, profane, or offensive only if the speech could not plausibly be interpreted as commenting on a political or social issue.

The School District invokes a parade of horribles that, in its view, would follow from our framework: protecting ambiguously lewd speech that comments on political or social issues—like the bracelets in this case— will encourage students to engage in more egregiously sexualized advocacy campaigns, which the schools will be obliged to allow. *See* Pa. Sch. Bd. Ass'n Amicus Br. in Supp. of Appellant at 19 (listing examples, including "I ♥ Balls!" apparel for testicular cancer, and "I ♥ Va Jay Jays" apparel for the Human Papillomaviruses); App. 275–76 (raising the possibility of apparel bearing the slogans "I ♥ Balls!" or "I ♥ Titties!"). Like all slippery-slope arguments, the School District's point can be inverted with equal logical force. If schools can categorically regulate terms like "boobies" even when the

55

message comments on a social or political issue, schools could eliminate all student speech touching on sex or merely having the potential to offend. *See* Frederick Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361, 381 (1985) ("[I]n virtually every case in which a slippery slope argument is made, the opposing party could with equal formal and linguistic logic also make a slippery slope claim."). The ease of turning a slippery-slope argument on its head explains why the persuasiveness of such a contention does not depend on its logical validity. *Id.* Instead, the correctness of a slippery-slope argument depends on an empirical prediction that a proposed rule will increase the likelihood of some other undesired outcome occurring. *Id.* ("To some people, one argument will seem more persuasive than the other because the underlying empirical reality . . . makes one equally logical possibility seem substantially more likely to occur than the other."); *see also* Eugene Volokh, *The Mechanism of the Slippery Slope*, 116 Harv. L. Rev. 1026, 1066–71 (2003) (making a similar point in the context of extending precedent). Because courts usually lack the data necessary for such a prediction, "fear of . . . what's at the bottom of a long, slippery slope is not a good reason for today's decision." *Marozsan v. United States*, 852 F.2d 1469, 1499 (7th Cir. 1988) (en banc) (Easterbrook, J., dissenting). "The terror of extreme hypotheticals produces much bad law," and so our answer to the School District's "extreme hypothetical[s]" is that we will "cross that bridge when we come to it."

*Id.*

To make matters worse, the School District has greased the supposedly slippery slope by omitting any empirical evidence. We have no reason to think either that the parents of middle-school students will be willing to allow their children to wear apparel advocating political or social messages in egregious terms or that a student will overcome the typical middle-schooler's embarrassment, immaturity, and social pressures by wearing such apparel. And many of the School District's hypotheticals pose no worries under our framework. A school could categorically restrict an "I ♥ tits! (KEEP A BREAST)" bracelet because, as the Supreme Court explained in *Pacifica*, the word "tits" (and also presumably the diminutive "titties") is a patently offensive reference to sexual organs and thus obscene to minors. *See Pacifica Found.*, 438 U.S. at 745–46 (plurality opinion) (explaining that the comedian George Carlin's seven "dirty" words, which includes "tits," "offend for the same reasons that obscenity offends"); *see also LaVine*, 257 F.3d at 989 (concluding that a poem "filled with imagery of violent death and suicide" was not "vulgar, lewd, obscene, or plainly offensive because it was "not 'an elaborate, graphic, and explicit sexual metaphor' as was the student's speech in *Fraser*, nor [did] it contain the infamous seven words that cannot be said on the public airwaves"); *cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517–18 (2009) (concluding

it was not arbitrary or capricious for the FCC to regulate even "isolated uses of sexual and excretory words," including Carlin's seven "dirty" words, because "[e]ven isolated utterances can be made in pander[ing], . . . vulgar and shocking manners" and can thus "constitute harmful first blow[s] to children" (alterations in original)).  The same is true of a student's drawings of stick figures in sexual positions, even if used to promote contraceptive use.  *Cf. R.O. ex rel. Ochshorn City Sch. Dist.*, 645 F.3d 533, 543 (2d Cir. 2011).  And even if students engage in more questionable speech, the school retains the government's normal sovereign authority to regulate speech as well as its additional powers as educator to restrict speech under *Tinker*, *Kuhlmeier*, and *Morse*.  *See, e.g.*, *Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013) (holding that a school's prohibition on wearing T-shirts depicting the Confederate battle flag was permissible under *Tinker* because of a history of racial tension and disruptions related to the Confederate flag).

By contrast, there is empirical support for the opposite worry.  Some schools, if empowered to do so, might eliminate all student speech touching on sex or merely having the potential to offend.  Indeed, the Middle School's administrators seemed inclined to do just that.  They initially testified that they could ban the word "breast," even if used in the context of a breast-cancer-awareness campaign, because the word, by itself,

58

"can be construed as [having] a sexual connotation."
App. 490, 497. If anything, the fear of a slippery slope
cuts against the School District.

In a similar vein, we need not speculate on
context-dependent hypotheticals to give guidance to
schools and district courts. The fault lines of our
framework are adequately mapped out in the rest of First
Amendment jurisprudence. The Supreme Court's
obscenity-to-minors case law marks the contours of
plainly lewd speech. *See, e.g.*, *Brown v. Entm't Merchs.
Ass'n*, 131 S. Ct. 2729, 2735 (refusing to extend the
categorical nonprotection for obscenity to minors to
speech that is violent from a minor's perspective);
*Ginsberg*, 390 U.S. at 638 (approving a state prohibition
on selling minors sexual material that would be obscene
from the minor's perspective). Those contours
necessarily admit of some flexibility and can be
"adjust[ed] . . . 'to social realities by permitting the
[sexual] appeal of this type of material to be assessed"
from the minors' perspective. *Id.*; *see also Fox
Television Stations, Inc.*, 556 U.S. at 520 (explaining that
based on the obscenity-to-minors case law, the FCC
properly "dr[aws] distinctions between the offensiveness
of particular words based upon the context in which they
appeared" on case-by-case basis without having to rely
on empirical evidence as to the degree of offensiveness).
And the government is not a stranger to determining
whether speech plausibly comments on a political or

59

social issue. For that, we look to case law on whether speech involves a matter of public concern. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("*Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. . . . If the answer is yes, then the possibility of a First Amendment claim arises."). Of course, these rules lack "perfect clarity"— just as every legal rule contains fuzzy borders. *Brown*, 131 S. Ct. at 2764 (Breyer, J., dissenting); *cf. United States v. Williams*, 553 U.S. 285, 304 (2008) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."). Even so, just because a "precise standard" for political speech or plain lewdness (obscenity to minors) "proves elusive," it is still "easy enough to identify instances that fall within a legitimate regulation." *Brown*, 131 S. Ct. at 2764 (Breyer, J., dissenting). Over time, the fault lines demarcating plainly lewd speech and political or social speech will settle and become more rule-like as precedent accumulates.

To recap: Under the government's sovereign authority, a school may categorically ban obscenity, fighting words, and the like in schools; the student-speech cases do not supplant the government's sovereign powers to regulate speech. *See, e.g.*, *Doe v. Pulaski*

60

*Cnty. Special Sch. Dist.*, 306 F.3d 616, 626, 626–27 (8th Cir. 2002) (en banc) (holding that the government, as K-12 educator, could punish a student for making a true threat); *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 118 (2d Cir. 2012) (Pooler, J., dissenting) ("Indeed, despite the expansion of school-specific exceptions to the First Amendment's general prohibition against government restrictions on speech, certain well-settled rules apply to adults and adolescents alike."). Under *Fraser*, a school may categorically restrict plainly lewd, vulgar, or profane speech that "offends for the same reasons obscenity offends" regardless of whether it can plausibly be interpreted as commenting on social or political issues. *Saxe*, 240 F.3d at 213 (quoting *Fraser*, 478 U.S. at 685). As we have explained, see *supra* at 20–21, plainly lewd speech cannot, by definition, be plausibly interpreted as political or social commentary because the speech offends for the same reason obscenity offends and thus has slight social value. *Fraser* also permits a school to categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning so long as it could not also plausibly be interpreted as commenting on a social or political issue. But *Fraser* does not permit a school to categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning and could plausibly interpret as commenting on a social or political issue. And of course, if a reasonable observer could not interpret the

61

speech as lewd, vulgar, or profane, then *Fraser* simply does not apply. As always, a school's other powers over student speech under *Tinker*, *Kuhlmeier*, and *Morse* remain as a backstop.

### C. The Middle School's ban on "I ♥ boobies! (KEEP A BREAST)" bracelets

Under this framework, the School District's bracelet ban is an open-and-shut case. The "I ♥ boobies! (KEEP A BREAST)" bracelets are not plainly lewd. The slogan bears no resemblance to Fraser's "pervasive sexual innuendo" that was "plainly offensive to both teachers and students." *Fraser*, 478 U.S. at 683. Teachers had to request guidance about how to deal with the bracelets, and school administrators did not conclude that the bracelets were vulgar until B.H. and K.M. had worn them every day for nearly two months. In addition, the Middle School used the term "boobies" in announcing the bracelet ban over the public address system and the school television station. What's more, the bracelets do not contain language remotely akin to the seven words that are considered obscene to minors on broadcast television. *Pacifica Found.*, 438 U.S. at 745–46 (plurality opinion); *LaVine*, 257 F.3d at 989 (concluding that speech was not vulgar, lewd, obscene, or plainly offensive because it was "not 'an elaborate, graphic, and explicit sexual metaphor' as was the student's speech in *Fraser*, nor [did] it contain the

62

infamous seven words that cannot be said on the public airwaves" under *Pacifica*). Indeed, the term "boobie" is no more than a sophomoric synonym for "breast." And as the School District also concedes, a reasonable observer would plausibly interpret the bracelets as part of a national breast-cancer-awareness campaign, an undeniably important social issue. Oral Arg. Tr. at 10:11–16; *see also K.J. ex rel. Braun v. Sauk Prairie Sch. Dist.*, No. 11-CV-622, slip op. at 14 (W.D. Wis. Feb. 6, 2012) ("When one reads the entire phrase, it is clearly a message designed to promote breast cancer awareness."). Accordingly, the bracelets cannot be categorically banned under *Fraser*.[22]

## IV.

*Fraser*, of course, is only one of four school-specific avenues for regulating student speech.[23] The

---

[22] Because we conclude that the slogan is not plainly lewd and is plausibly interpreted as commenting on a social issue, the bracelets are protected under *Fraser*. As a result, we need not determine whether a reasonable observer could interpret the bracelets' slogan as lewd.

[23] As the Supreme Court has recently reaffirmed, there *might* be other exceptions to *Tinker* that have not yet been identified by the courts. *See Morse*, 551 U.S. at 408–09 (identifying a new exception to the *Tinker* framework for speech that is reasonably interpreted as advocating illegal drug use and that is not plausibly

parties rightly agree that *Kuhlmeier* and *Morse* do not apply: no one could reasonably believe that the Middle School was somehow involved in the morning fashion decisions of a few students, and no one could reasonably interpret the bracelets as advocating illegal drug use.

That leaves only *Tinker* as possible support for the School District's ban. Under *Tinker*'s "general rule," the government may restrict school speech "that threatens a specific and substantial disruption to the school environment" or "inva[des] . . . the rights of others." *Saxe*, 240 F.3d at 211 (citing *Tinker*, 393 U.S. at 504). "[I]f a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass

interpreted as commenting on any political or social issue). *Compare id.* at 405 ("*Fraser* established that the mode of analysis set forth in *Tinker* is not absolute."), *and id.* at 406 ("And, like *Fraser*, [*Kuhlmeier*] confirms that the rule of *Tinker* is not the only basis for restricting student speech."), *with id.* at 423 (Alito, J., concurring) ("I join the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools *necessarily* justify any other speech restrictions." (emphasis added)). Here, however, the School District relies solely on the existing school-speech framework and does not propose any new bases for restricting student speech.

constitutional muster." *Id.* at 212; *J.S. v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 928 (3d Cir. 2011) (en banc) ("[T]he School District need not prove with absolute certainty that substantial disruption will occur."). The School District has the burden of showing that the bracelet ban is constitutional under *Tinker*. *See J.S.*, 650 F.3d at 928. That it cannot do.

*Tinker* meant what it said: "a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Id.* Tinker's black armbands did not meet this standard, even though the armbands "caused comments, warnings by other students, the poking of fun at them, . . . a warning by an older football player that other, nonprotesting students had better let them alone," and the "wreck[ing]" of a math teacher's lesson period. *Tinker*, 393 U.S. at 517 (Black, J., dissenting).

Here, the record of disruption is even skimpier. When the School District announced the bracelet ban, it had no more than an "undifferentiated fear or remote apprehension of disturbance." *Sypniewski*, 307 F.3d at 257. The bracelets had been on campus for at least two weeks without incident. *B.H.*, 827 F. Supp. 2d at 408; *see also* App. 13 ("[N]one of the three principals had heard any reports of disruption or student misbehavior linked to the bracelets. Nor had any of the principals heard reports of inappropriate comments about

65

'boobies.'"). That track record "speaks strongly against a finding of likelihood of disruption." *Sypniewski*, 307 F.3d at 254.

The School District instead relies on two incidents that occurred after the ban. In one, a female student told a teacher that she believed some boys had remarked to girls about their "boobies" in relation to the bracelets— an incident that was never confirmed. *B.H.*, 827 F. Supp. 2d at 408. In the other, two female students were discussing the bracelets during lunch, and a boy interrupted them to say "I want boobies" while "making inappropriate gestures with two spherical candies." *Id.* The boy was suspended for a day. *Id.*

Even assuming that disruption arising after a school's speech restriction could satisfy *Tinker*—a question we need not decide today—these two isolated incidents hardly bespeak a substantial disruption caused by the bracelets. "[S]tudent expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to 'a showing of mild curiosity' by other students, 'discussion and comment' among students, or even some 'hostile remarks' or 'discussion outside of the classrooms' by other students." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1271–72 (11th Cir. 2004) (internal quotation marks and citations omitted). Given that Tinker's black armband—worn to protest a

66

controversial war and divisive enough to prompt reactions from other students—was not a substantial disruption, neither is the "silent, passive expression" of breast-cancer awareness.[24] *Tinker*, 393 U.S. at 508. If

---

[24] According to B.H. and K.M., *Tinker*'s substantial-disruption standard does not permit a school to restrict speech because of the heckler's veto of other students' disruptive reactions. *See* Appellees' Br. at 35 (emphasis added). Because no forecast of substantial disruption would be reasonable on this record under any meaning of that term, we need not determine the precise interplay between the anti-heckler's veto principle present elsewhere in free-speech doctrine and *Tinker*'s substantial-disruption standard in public schools. *Compare Zamecnik*, 636 F.3d at 879 (noting that *Tinker* endorsed both the heckler's veto doctrine and the substantial-disruption test and concluding that other students' harassment of "Zamecnik because of their disapproval of her ["Be Happy, Not Gay" T-shirt] is not a permissible ground for banning it"), *and Holloman*, 370 F.3d at 1275–76 (interpreting *Tinker* as endorsing an anti-heckler's veto principle, concluding that "[w]hile the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason"), *with Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 38 (10th Cir. Apr. 8,

67

anything, the fact that these incidents did not occur until *after* the School District banned the bracelets suggests that the ban "*exacerbated* rather than contained the disruption in the school." *J.S.*, 650 F.3d at 931 (drawing this same conclusion on a similar record).

Undeterred, the School District invokes the other half of *Tinker*'s general rule, arguing that the bracelets invade other students' Title IX rights to be free from sexual harassment. *See Tinker*, 393 U.S. at 513. Under Title IX, students may sue federally-funded schools that "act[] with deliberate indifference" to "harassment that is so severe, pervasive, and objectively offensive . . . that the victim students are effectively denied equal access to an institution's resources and opportunities." *Saxe*, 240 F.3d at 205–06 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 516 U.S. 629, 651 (1999)). According to the School District, the "I ♥ boobies! (KEEP A BREAST)" bracelet was "deemed inappropriate for school due to the likelihood of a resultant increase in student-on-student sexual harassment." Sch. Dist.'s Br. at 54.

---

2013) ("Plaintiffs note that most disruptions occurred only because of wrongful behavior of third parties and that no Plaintiffs participated in these activities. . . . This argument might be effective outside the school context, but it ignores the 'special characteristics of the school environment.'" (quoting *Tinker*, 393 U.S. at 506)).

That argument suffers from several flaws, not the least of which is the School District's failure to raise it in the District Court and that Court's consequent failure to address it. *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013) ("We generally refuse to consider issues that the parties have not raised below." (citing *Singleton v. Wulff*, 428 U.S. 106, 120 (1976))). But there is an even more basic reason why the School District's invocation of Title IX is not the shield it claims to be. Even assuming that protecting students from harassment under Title IX would satisfy *Tinker*'s rights-of-others prong,[25] the School District does not explain

---

[25] As we have repeatedly noted, "the precise scope of *Tinker*'s 'interference with the rights of others' language is unclear." *Saxe*, 240 F.3d at 217 (quoting *Tinker*, 393 U.S. at 504); *DeJohn v. Temple Univ.*, 537 F.3d 301, 319 (3d Cir. 2008). And the Supreme Court has "never squarely addressed whether harassment, when it takes the form of pure speech, is exempt from First Amendment protection." *Saxe*, 240 F.3d at 207. We need not address either of these points today. Even if *Tinker* permits school regulation of pure speech that would constitute "harassment" under Title IX, the School District has not offered any explanation or evidence of how passively wearing the "I ♥ boobies! (KEEP A BREAST)" bracelets would create such a severe and pervasive environment in the Middle School. *Cf. Saxe*, 240 F.3d at 204 (Alito, J.) ("There is no categorical 'harassment exception' to the

69

why the bracelets would breed an environment of pervasive and severe harassment. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 320 (3d Cir. 2008) ("[U]nless harassment is qualified with a standard akin to a severe or pervasive requirement, [an anti-]harassment policy may suppress core protected speech."); *Saxe*, 240 F.3d at 217 (rejecting a school district's similar argument that it could ban speech creating a "hostile environment" without showing that the particular speech covered by the policy would create a severe or pervasive environment); *see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204*, 523 F.3d 668, 676 (7th Cir. 2008) ("[I]t is highly speculative that allowing the plaintiff to wear a T-shirt that says "Be Happy, Not Gay" would have even a slight tendency to provoke such incidents [of student-on-student harassment], or for that matter to poison the educational atmosphere.").

The bracelet ban cannot be upheld on the authority of *Tinker*.

## V.

Because the School District's ban cannot pass scrutiny under *Fraser* or *Tinker*, B.H. and K.M. are likely to succeed on the merits. In light of that conclusion, the

First Amendment's free speech clause."); *Rodriguez v. Maricopa Cnty. Cmty. College Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) (agreeing with *Saxe*'s statement).

remaining preliminary-injunction factors also favor them. The ban prevents B.H. and K.M. from exercising their right to freedom of speech, which "unquestionably constitutes irreparable injury." *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). An after-the-fact money judgment would hardly make up for their lost opportunity to wear the bracelets in school. *See Elrod*, 427 U.S. at 374 n.29 ("The timeliness of political speech is particularly important.").

And the preliminary injunction does not "result in even greater harm to" the School District, the non-moving party. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). The School District complains that unless the bracelet ban stands, it "has no clear guidance" on how to enforce its dress code. Appellant's Br. at 60. But the injunction addresses only the School District's ban of the "I ♥ boobies! (KEEP A BREAST)" bracelets. It does not enjoin the School District's regulation of other types of apparel, such as the "Save the ta-tas" T-shirt or testicular-cancer-awareness apparel bearing the phrase "feelmyballs.org." Whether the injunction stays or goes, the School District will have to continue making individualized assessments of whether it may restrict student speech consistent with the First Amendment, just as school administrators have always had to do. *See, e.g., Castorina ex rel. Rewt v.*

71

*Madison Cnty. Sch. Bd.*, 246 F.3d 536, 543 (6th Cir. 2001) ("The foregoing discussion of the three Supreme Court . . . cases demonstrates the importance of the factual circumstances in school speech cases . . . ."). The District Court's injunction against the bracelet ban does not change that.

Lastly, granting the preliminary injunction furthers the public interest. The School District argues that the injunction eliminates its "authority to manage its student population" and thus harms the public. Appellant's Br. at 61. Again, that hyperbolic protest ignores the narrow breadth of the injunction, which addresses only the constitutionality of the bracelet ban under the facts of this case. More importantly, allowing a school's unconstitutional speech restriction to continue "vindicates no public interest." *K.A.*, 2013 WL 915059, at *11 (citation omitted). For these reasons, the District Court did not abuse its discretion by enjoining the School District's bracelet ban.

\* \* \* \* \*

School administrators "have a difficult job," and we are well-aware that the job is not getting any easier. *Morse*, 551 U.S. at 409. Besides the teaching function, school administrators must deal with students distracted by cell phones in class and poverty at home, parental under- and over-involvement, bullying and sexting, preparing students for standardized testing, and ever-

diminishing funding. When they are not focused on those issues, school administrators must inculcate students with "the shared values of a civilized social order." *Fraser*, 478 U.S. at 683; *see also McCauley v. Univ. of the V.I.*, 618 F.3d 232, 243 (3d Cir. 2010) (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)) ("Public elementary and high school education is as much about learning how to be a good citizen as it is about multiplication tables and United States history.").

We do not envy those challenges, which require school administrators "to make numerous difficult decisions about when to place restrictions on speech in our public schools." *Morgan v. Swanson*, 659 F.3d 359, 420 (5th Cir. 2011) (en banc) (majority opinion of Elrod, J.). And the School District in this case was not unreasonably concerned that permitting "I ♥ boobies! (KEEP A BREAST)" bracelets in this case might require it to permit other messages that were sexually oriented in nature. But schools cannot avoid teaching our citizens-in-training how to appropriately navigate the "marketplace of ideas." Just because letting in one idea might invite even more difficult judgment calls about other ideas cannot justify suppressing speech of genuine social value. *Tinker*, 393 U.S. at 511 ("The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues,' (rather)

73

than through any kind of authoritative selection.'" (quoting *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967))); *see id.* at 511 ("[S]chool officials cannot suppress 'expressions of feelings with which they do not wish to contend.'" (citation omitted)).

We will affirm the District Court's order granting a preliminary injunction.

HARDIMAN, *Circuit Judge*, dissenting with whom CHAGARES, JORDAN, GREENAWAY, JR., and GREENBERG, join.

Today the Court holds that twelve-year-olds have a constitutional right to wear in school a bracelet that says "I ♥ boobies! (KEEP A BREAST)." Because this decision is inconsistent with the Supreme Court's First Amendment jurisprudence, I respectfully dissent.

I

My colleagues conclude that the Supreme Court's decision in *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), cannot justify the Easton Area School District's bracelet ban "because [the bracelets] comment on a social issue." Maj. Typescript at 6. This limitation on the ability of schools to regulate student speech that could reasonably be deemed lewd, vulgar, plainly offensive, or constituting sexual innuendo finds no support in *Fraser* or its progeny. The Majority's "high value speech" modification of *Fraser* is based on the following two premises it derives from the Supreme Court's decision in *Morse v. Frederick*, 551 U.S. 393 (2007): first, that Justice Alito's concurrence in *Morse* is the "controlling" opinion in that case, Maj. Typescript at 21 n.10, 43, 45, 47; and second, that *Morse* "modified" the Supreme Court's decision in *Fraser*, Maj. Typescript at 6, 46–51. Both premises are wrong.

A

I begin with the Majority's first premise, namely, that Justice Alito's concurrence in *Morse* is the "controlling" opinion in that case, despite the fact that Chief Justice

1

Roberts's majority opinion was joined in full by four other Justices. Maj. Typescript at 36–46. This distinctly minority view is contrary both to the understanding of *Morse* expressed by eight of our sister Courts of Appeals and to what we ourselves have repeatedly articulated to be the Court's holding in *Morse*. By endorsing the Fifth Circuit's mistaken understanding of *Morse*, the Majority applies an incorrect legal standard that leads to the unfortunate result the Court reaches today.

The notion that Justice Alito's concurrence in *Morse* is the controlling opinion flows from a misunderstanding of the Supreme Court's "narrowest grounds" doctrine as established in *Marks v. United States*, 430 U.S. 188 (1977). In *Marks*, the petitioners had been convicted of distributing obscene materials pursuant to jury instructions that were modeled on the definition of obscenity articulated in *Miller v. California*, 413 U.S. 15 (1973). *Marks*, 430 U.S. at 190. Because the petitioners' conduct occurred before the Court had decided *Miller*, they argued that due process entitled them "to jury instructions not under *Miller*, but under the more favorable [obscenity] formulation of *Memoirs v. Massachusetts*." *Id.* That formulation was unclear, however, because the *Memoirs* Court had issued a fractured decision; no more than three of the six Justices who voted for the judgment endorsed any one of three separate opinions, each of which articulated a different standard for obscenity. *See Memoirs v. Massachusetts*, 383 U.S. 413, 414, 418 (1966) (plurality opinion) (Justice Brennan, joined by Chief Justice Warren and Justice Fortas, stating that obscenity may be proscribed if it is "utterly without redeeming social value"); *id.* at 421, 424 (Black and Douglas, JJ., concurring in judgment) (concurring separately on the grounds that obscenity cannot be

2

proscribed); *id.* at 421 (Stewart, J., concurring in judgment) (concurring on the grounds that only hard-core pornography is proscribable as obscene). The lack of a majority opinion in *Memoirs* led the Sixth Circuit in *Marks* to reject the petitioners' argument that the plurality's "utterly without redeeming social value" standard was the governing rule. It reasoned that because "the *Memoirs* standards never commanded the assent of more than three Justices at any one time . . . *Memoirs* never became the law." *Marks*, 430 U.S. at 192 (describing the lower court's holding).

On appeal, the Supreme Court rejected the Sixth Circuit's reasoning and articulated the following standard: "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds . . . .'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). Based on this reasoning, the Court concluded that because three Justices joined the plurality opinion and Justices Black and Douglas "concurred on broader grounds," "[t]he view of the *Memoirs* plurality . . . constituted the holding of the Court and provided the governing standards." *Marks*, 430 U.S. at 193–94.

As *Marks* demonstrates, the narrowest grounds rule is a necessary tool for deciphering the holding of the Court when there is no majority opinion. *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (attempting to apply the *Marks* rule to derive a holding in the "fractured decision" *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978)). Contrary to the Majority's holding today, neither *Marks* nor other Supreme Court decisions support the

3

"unprecedented argument that a statement of legal opinion joined by five Justices of th[e] Court does not carry the force of law," *Vasquez v. Hillery*, 474 U.S. 254, 261 n.4 (1986). Rather, the narrowest grounds rule applies only to "discern a single holding of the Court in cases in which no opinion on the issue in question has garnered the support of a majority." *Id.*; *cf.* Black's Law Dictionary 1201 (9th ed. 2009) (defining a "majority opinion" as "[a]n opinion joined in by more than half the judges considering a given case").

Unable to find persuasive Supreme Court authority to buttress its novel reading of *Marks*, the Majority argues that our Court has "applied the narrowest-grounds approach in circumstances beyond those posed by *Marks*, including to determine holdings in majority opinions." Maj. Typescript at 37–38 (footnotes, citation, and internal quotation marks omitted). For support, the Majority cites our decisions in *Horn v. Thoratec Corp.*, 376 F.3d 163 (3d Cir. 2004), and *United States v. Bishop*, 66 F.3d 569 (3d Cir. 1995). Maj. Typescript at 39–42. Neither case counsels the Majority's application of the narrowest-grounds doctrine to interpret *Morse*.

In *Horn*, we looked to Justice Breyer's concurrence in *Medtronic v. Lohr*, 518 U.S. 470 (1996), for guidance on how to address an issue central to our case, but that the *Lohr* Court discussed only in dicta. *See Horn*, 376 F.3d at 175–76 (comparing Justice Breyer's "more narrow" view on preemption with "Justice Stevens' sweeping pronouncement [in his plurality opinion] that [the statute at issue] almost never preempts a state common law claim"). Likewise, in *Bishop*, we cited Justice Kennedy's concurrence in *United States v. Lopez*, 514 U.S. 549 (1995), in order to reinforce the already established principle that courts must exercise "'great

4

restraint' before a court finds Congress to have overstepped its commerce power" despite *Lopez*'s revolutionary holding. *Bishop*, 66 F.3d at 590 (quoting *Lopez*, 514 U.S. at 568 (Kennedy, J., concurring)). Critically, in neither of these cases did we indicate a belief that a concurring Justice can create a new rule of law simply by both asking and answering a question left unaddressed by the majority opinion. In fact, we noted that Justice Breyer's concurrence in *Horn* was particularly persuasive because "Justice Breyer did not discuss issues in his concurring opinion that Justice Stevens, writing on behalf of the four-judge plurality, did not reach." *Horn*, 376 F.3d at 175. That is not the case here.

The Majority concedes that a concurring "justice's opinion 'cannot add to what the majority opinion holds' by 'binding the other four [j]ustices to what they have not said.'" Maj. Typescript at 39 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 462 n.3 (1990) (Scalia, J., dissenting)). Yet by holding that Justice Alito's concurrence "controls the majority opinion in *Morse*," Maj. Typescript at 36, the Majority violates this very principle. The majority in *Morse* noted that "this is plainly not a case about political debate," *Morse*, 551 U.S. at 403, and refused to address what the result of the case would have been had Frederick's banner been "political." The Majority implies that Justice Alito's concurrence provides a definitive, "controlling" answer to fill the void left by the *Morse* majority opinion, but the Supreme Court has disavowed this approach: "The Court would be in an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address, under compulsion of [the dissent's] new principle that silence implies agreement." *Alexander v. Sandoval*, 532 U.S. 275, 285 n.5

5

(2001). Put another way, a majority "holding is not made coextensive with the concurrence because [the majority] opinion does not expressly preclude (is 'consistent with[]' . . .) the concurrence's approach." *Id.*

Notwithstanding the Majority's statement to the contrary, we have never applied the *Marks* rule to hold that a concurrence may co-opt an opinion joined by at least five Justices. Rather, consistent with *Marks*, "we have looked to the votes of dissenting Justices if they, combined with votes from *plurality or concurring opinions*, establish a majority view on the relevant issue." *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (emphasis added); *see also Student Pub. Interest Research Grp. of N.J., Inc. v. AT&T Bell Labs.*, 842 F.2d 1436, 1451 & n.16 (3d Cir. 1988). In *Donovan*, we used *Marks* to analyze the Supreme Court's "fractured" decision in *Rapanos v. United States*, 547 U.S. 715 (2006), a case in which only three other Justices joined Justice Scalia's plurality opinion and four others dissented. *Donovan*, 661 F.3d at 179, 182. Nowhere did we suggest that *Marks* would have been applicable had *Rapanos* featured a single majority opinion. Likewise, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682 (3d Cir. 1991), *rev'd on other grounds*, 505 U.S. 833 (1992), we held that *Marks* stands for the proposition that "the controlling opinion *in a splintered decision* is that of the Justice or Justices who concur on the 'narrowest grounds.'" *Casey*, 947 F.2d at 693 (emphasis added). We then applied this principle while interpreting the Supreme Court's *plurality* decisions in *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989), and *Hodgson v. Minnesota*, 497 U.S. 417 (1990). *See Casey*, 947 F.3d at 695–96 (noting that in *Webster* "[t]he five Justices in the majority issued three opinions," none of which

garnered five votes on the legal issue in dispute, and that "*Hodgson* was decided in a similar manner"). Once again, we gave no indication that *Marks* would have applied had five Justices or more joined the same opinion.

I also find it significant that, in the six years since *Morse* was decided, nine of ten appellate courts have cited as its holding the following standard articulated by Chief Justice Roberts in his opinion for the Court: "[A] principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use," *Morse*, 551 U.S. at 403.[1]   Not

---

[1] *See Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) ("[T]he Supreme Court has determined that public schools may 'take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use' because of the special nature of the school environment and the dangers posed by student drug use." (citations omitted)); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 435 (4th Cir. 2013) ("[S]chool officials can regulate student speech that can plausibly be interpreted as promoting illegal drugs because of 'the dangers of illegal drug use.'" (citation omitted)); *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 332–33 (6th Cir. 2010) ("As this Court has already recognized, however, the *Morse* holding was a narrow one, determining no more than that a public school may prohibit student expression at school or at school-sponsored events during school hours that can be 'reasonably viewed as promoting drug use.'" (citation omitted)); *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011) (noting that promoting "the use of illegal drugs, [is] a form of advocacy in the school setting that can be

one of these courts indicated that Justice Alito's concurrence controls, or that his dicta regarding "political or social speech" altered or circumscribed the Court's holding in *Morse*. We too have articulated the import of *Morse* consistent with these eight appellate courts: "[I]n *Morse*, the Court held that 'schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use.'" *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 107 (3d Cir.

---

prohibited without evidence of disruption" (citation omitted)); *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 761 (8th Cir. 2011) ("Chief Justice Roberts reviewed the Court's approach in these prior decisions before holding 'that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use.'" (citation omitted)); *Redding v. Safford Unified Sch. Dist. No. 1*, 531 F.3d 1071, 1094 (9th Cir. 2008), *rev'd on other grounds*, 557 U.S. 364 (2009) ("[S]chools can 'restrict student expression that they reasonably regard as promoting illegal drug use.'" (citation omitted)); *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1228 (10th Cir. 2009) ("[A] public school may prohibit student speech at school or at a school-sponsored event during school hours that the school 'reasonably view[s] as promoting illegal drug use.'" (citation omitted)); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007) ("[T]he special characteristics of the school environment and the governmental interest in stopping student drug abuse . . . allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." (citation omitted)).

8

2013) (citation omitted).[2]   This widespread consensus is further proof that Chief Justice Roberts's majority opinion, not Justice Alito's concurrence, is the controlling opinion in *Morse*.

Before today, only the Fifth Circuit had held otherwise.  *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 746 n.25 (5th Cir. 2009) ("We have held Justice Alito's concurrence to be the controlling opinion in *Morse*." (citing *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007)); *see also Morgan*, 589 F.3d at 745 n.15 (interpreting the holding in *Morse* to be "that schools may regulate speech that a reasonable observer would interpret as advocating illegal drug use and that could not be interpreted as commenting on any political or social issue" (internal quotation marks omitted)).[3]   However, the Fifth Circuit did

---

[2] The Majority cites our opinion in *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011), as evidence that we "previously" had the "intuition" that Justice Alito's concurrence controls the Supreme Court's opinion in *Morse*.  Maj. Typescript at 45 n.17.  But in *J.S.*, as in *K.A.*, we explicitly noted that the Supreme Court "*held* that 'the special characteristics of the school environment and the governmental interest in stopping drug abuse allow schools to restrict student expression that they reasonably regard as promoting illegal drug use.'"  650 F.3d at 927 (emphasis added) (quoting *Morse*, 551 U.S. at 408) (alterations, citation, and internal quotation marks omitted).

[3] The Majority claims that both the Sixth Circuit and Tenth Circuit agree with the Fifth Circuit that Justice Alito's concurrence is controlling.  *See* Maj. Typescript at 45 n.17

9

not cite *Marks* or any other "narrowest grounds" case and provided no justification to support its conclusion that Justice Alito's concurrence is the controlling opinion in *Morse*. As the Seventh Circuit has aptly noted:

> The plaintiff calls Justice Alito's concurrence the "controlling" opinion in *Morse* because Justices Alito and Kennedy were part of a five-Justice majority, so that their votes were crucial to the decision. But *they joined the majority opinion, not just the decision*, and by doing so they made it a majority opinion and not merely, as the plaintiff believes (as does the Fifth Circuit, *Ponce v. Socorro Independent School*

---

(citing *Barr v. Lafon*, 538 F.3d 554, 564 (6th Cir. 2008), and *Corder*, 566 F.3d at 1228). I disagree. In *Barr*, the Sixth Circuit recognized Chief Justice Roberts's articulation that "a public school may prohibit student speech at school or at a school-sponsored event during school hours that the school 'reasonably view[s] as promoting illegal drug use'" as the Court's "narrow holding." 538 F.3d at 564 (citation omitted). Although the opinion went on to discuss Justice Alito's concurrence, the Sixth Circuit never opined that the concurrence controls or otherwise modifies what the court had previously described as *Morse*'s "narrow holding." *See id.*; *see also Defoe*, 625 F.3d at 332–33 & n.5 (describing the same "narrow" holding in *Morse* before discussing Justice Alito's concurrence in a footnote). The same can be said for the Tenth Circuit's decision in *Corder*, which essentially parrots *Barr*'s description of *Morse*'s majority opinion and Justice Alito's concurrence. *See Corder*, 566 F.3d at 1228 (quoting *Barr*, 538 F.3d at 564).

> *District*, 508 F.3d 765, 768 (5th Cir. 2007)), a plurality opinion. The concurring Justices wanted to emphasize that in allowing a school to forbid student speech that encourages the use of illegal drugs the Court was not giving schools carte blanche to regulate student speech. And they were expressing *their own view* of the permissible scope of such regulation.

*Nuxoll ex rel. Nuxoll v. Indian Prarie Sch. Dist. # 204*, 523 F.3d 668, 673 (7th Cir. 2008) (emphasis added) (citation omitted). This interpretation of the relationship between Justice Alito's concurrence and the majority opinion in *Morse* is the correct one because it is faithful to *Marks* and its progeny.

For the reasons stated, I would not read Justice Alito's concurrence as altering or circumscribing a majority opinion for the Court that he joined *in toto*. Thus, the Court's holding in *Morse* remains the familiar articulation that has been consistently stated, time and again, by this Court and eight other Courts of Appeals: "[A] principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use." *Morse*, 551 U.S. at 403.

B

If Justice Alito's concurrence is not the "controlling" opinion in *Morse*, the Majority has committed legal error by engrafting his dicta regarding "social or political" commentary as a limitation upon the ability of schools to regulate speech that runs afoul of *Fraser*. But even assuming,

11

*arguendo*, that Justice Alito's concurrence alters or circumscribes the Court's opinion in *Morse*, it is far from clear that it had anything to say about the realm *Fraser* carved out of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).

*Tinker* established the general rule that "student expression may not be suppressed unless school officials reasonably conclude that it will 'materially and substantially disrupt the work and discipline of the school.'" *Morse*, 551 U.S. at 403 (quoting *Tinker*, 393 U.S. at 513); *see also, e.g.*, *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001). *Tinker*'s "substantial disruption" test does not apply in every case, however. As then-Judge Alito wrote when he was a member of this Court, "the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption." *Id.* at 212; *see also J.S.*, 650 F.3d at 927 (emphasizing that the exceptions to *Tinker* are "narrow"). First came *Fraser*, in which the Supreme Court held that schools may restrict the manner in which a student conveys his message by forbidding and punishing the use of lewd, vulgar, indecent, or plainly offensive speech. *See Fraser*, 478 U.S. at 680–86. Then, in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the Court held that administrators may regulate speech that is school-sponsored or could reasonably be viewed as the school's own speech. *Id.* at 272–73. Most recently, in *Morse* the Court held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." *Morse*, 551 U.S. at 397.

As these cases indicate, "[s]ince *Tinker*, every Supreme Court decision looking at student speech has

expanded the kinds of speech schools can regulate." *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 507 (5th Cir. 2009); *cf. Morse*, 551 U.S. at 417 (Thomas, J., concurring) (observing that "the Court has since scaled back *Tinker*'s standard, or rather set the standard aside on an ad hoc basis"). In derogation of this consistent trend, the Majority makes us the first United States Court of Appeals to suggest that *Morse* has circumscribed *Fraser*, thereby limiting the ability of teachers and administrators to regulate student speech.

In addition to overriding the careful steps taken to allow schools to regulate student speech since *Tinker*, the Majority errs by placing *Morse* at the center of a case that has nothing whatsoever to do with illegal drug use. That *Morse* is not central to this case is borne out by the way the case was litigated and adjudicated. The District Court concluded that only the standards of *Tinker* and *Fraser* are implicated, and neither party ever argued otherwise. *See B.H. v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 394 (E.D. Pa. 2011) ("The two Supreme Court cases examining student speech that are most relevant to this case are *Fraser* and *Tinker*."). The School District primarily contends that the "I ♥ boobies!" bracelets are proscribable because they express sexual innuendo that can reasonably be classified in the middle school context as lewd, vulgar, and indecent speech. Plaintiffs rejoin that the word "boobies" is neither inherently sexual nor vulgar, especially when conspicuously tied to breast cancer awareness. Until the case reached the *en banc* Court, no party or judge had suggested that *Morse* provided the governing standard for this dispute. And rightly so, because this is a *Fraser* case, not a *Morse* case, and there are critical differences between the two.

13

Courts have recognized, time and again, that the three exceptions to *Tinker*'s general rule are independent "carve-outs." *See, e.g.*, *Saxe*, 240 F.3d at 212–14. The Supreme Court has given no indication—either in *Morse* or any of its subsequent decisions—that it has modified the standard, first articulated in *Fraser* more than 25 years ago, that governs how schools are to regulate speech they may reasonably deem lewd, vulgar, indecent, or plainly offensive. Moreover, although the appellate courts have had dozens of opportunities to do so, no court has suggested that *Morse* qualified *Fraser* in any way. Since *Morse*, we have had occasion to consider *Fraser* and have consistently "interpreted [it] to permit school officials to regulate 'lewd, vulgar, indecent, and plainly offensive speech in school.'" *J.S.*, 650 F.3d at 927 (quoting *Saxe*, 240 F.3d at 213) (emphasis and internal quotation marks omitted); *see also* *K.A.*, 710 F.3d at 107 ("In [*Fraser*], the Court held that schools may restrict the manner in which a student conveys his message by forbidding and punishing the use of lewd, vulgar, indecent, and plainly offensive speech." (citation omitted)); *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 212–13 (3d Cir. 2011) (same).

In fact, the appellate opinions addressing *Morse*, *Fraser*, and *Kuhlmeier* treat them as independent analytical constructs that permit schools to regulate certain types of speech that would otherwise be protected under *Tinker*. *See, e.g.*, *Hardwick*, 711 F.3d at 435 n.11 ("[W]e must continue to adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise."); *Doninger*, 642 F.3d at 353–54 ("[B]ecause the t-shirts were not vulgar, could not reasonably be perceived to bear the School's imprimatur, and did not

14

encourage drug use, they could be subject to regulation different from that permissible for adults in non-school settings only if they threatened substantial disruption to the work and discipline of the School." (citations omitted)).  It is especially notable that even the Fifth Circuit, which mistakenly held that Justice Alito's concurrence in *Morse* is "controlling," continues to treat the *Tinker* carve-outs as independent exceptions rather than overlapping categories of proscribable speech.  *See Morgan*, 589 F.3d at 745 n.15 (5th Cir. 2009) (characterizing *Fraser* as "holding schools may prohibit lewd, vulgar, obscene or plainly offensive student speech" and, in the same string citation, separately characterizing *Morse* as "holding that schools may regulate speech 'that a reasonable observer would interpret as advocating illegal drug use' and that could not be 'interpreted as commenting on any political or social issue'" (citations omitted)).  The Majority's own analysis demonstrates that threshold questions in a school speech case are whether the speech at issue is governed by one of the three *Tinker* carve-outs and, if not, whether the school acted properly under *Tinker*.  *See* Maj. Typescript at 63–64.

In addition, we have emphasized that the carve-outs touch on "several *narrow categories of speech* that a school may restrict even without the threat of substantial disruption." *K.A.*, 710 F.3d at 107 (emphasis added) (internal quotation marks omitted).  This does not mean, as the Majority suggests, that the carve-outs narrow one another.  *See* Maj. Typescript at 45 n.17 (citing *J.S.*, 650 F.3d at 927).  Rather, it is simply a recognition that they are narrow within their separate spheres.  Indeed, courts have been especially careful to underscore the narrowness of the Court's holding in *Morse*. *See, e.g.*, *Defoe*, 625 F.3d at 332–33 ("[T]he *Morse* holding

15

was a *narrow* one, determining *no more* than that a public school may prohibit student expression at school or at school-sponsored events during school hours that can be 'reasonably viewed as promoting drug use.'" (emphasis added) (citation omitted)); *Barr*, 538 F.3d at 564 (same); *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 741 (8th Cir. 2009) (same).

In *J.S.*, we too recognized the "narrowness of the Court's holding" in *Morse*. *J.S.*, 650 F.3d at 927.[4]  There, we declared that *Morse* did not apply to a school's punishment of a student for creating a MySpace profile using graphic language and imagery to disparage her teacher, *see J.S.*, 650 F.3d at 932 n.10 ("Indisputably, neither *Kuhlmeier* nor *Morse* governs this case.").  Instead, we indicated that "the only way for the punishment to pass constitutional muster is if . . . J.S.'s speech can be prohibited under the *Fraser* exception to *Tinker*."  *Id.* at 931–32.  If the proper standard under *Fraser* is the Majority's formulation of whether a student's lewd speech may "plausibly be interpreted as commenting on a social or political issue," surely we would have considered

---

[4] The Majority believes that this clause serves as an indicator that Justice Alito's concurrence narrowed the holding in *Morse* and, in turn, narrowed the speech that schools can proscribe under *Fraser*.  *See* Maj. Typescript at 45 n.17.  Contrary to the Majority's implication, in *J.S.* we neither addressed Justice Alito's discussion of student speech that touches on matters plausibly related to a social or political issue nor indicated a belief that his concurrence somehow modified the *Morse* Court's majority opinion, which we quoted verbatim as the Court's holding.  *See J.S.*, 650 F.3d at 927.

16

whether J.S.'s online profile touched on any such issue. Instead of doing so, we applied the *Fraser* test while disavowing the relevance of *Morse*.

The fact that courts have maintained analytical separation among the different *Tinker* carve-outs makes sense because the Supreme Court created each one for a unique purpose. In *K.A.* we addressed these "vital interests that enable school officials to exercise control over student speech even in the absence of a substantial disruption." *K.A.*, 710 F.3d at 107. The vital interest at issue in *Morse* that "allow[s] schools to restrict student expression that they reasonably regard as promoting illegal drug use" is "the special characteristics of the school environment, and the governmental interest in stopping student drug abuse." *Id.* (quoting *Morse*, 551 U.S. at 408). *Fraser* allowed schools to punish "lewd, indecent, or offensive speech," 478 U.S. at 683, to further "society's . . . interest in teaching students the boundaries of socially appropriate behavior," *K.A.*, 710 F.3d at 107 (quoting *Fraser*, 478 U.S. at 681). And in *Kuhlmeier*, the interest that "entitle[s] [educators] to exercise greater control over [school-sponsored publications]" is "to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *K.A.*, 710 F.3d at 107 (quoting *Kuhlmeier*, 484 U.S. at 271). The Court's willingness to curtail the First Amendment rights of students to enable schools to achieve these important goals vindicates the principle that "the rights of students 'must be applied in light of the special characteristics of the school environment.'" *Morse*, 551 U.S. at 397 (quoting *Kuhlmeier*,

17

484 U.S. at 266).  Because each case was intended to address a separate concern, I disagree with the Majority that language qualifying one type of carve-out applies equally to the others.

In sum, *Morse*'s "narrow" holding does not apply unless a school has regulated student speech that it viewed as advocating illegal drug use.  Notwithstanding its critical reliance on *Morse*, at one point the Majority seems to agree that *Morse* does not apply to this case when it states that "no one could reasonably interpret the bracelets as advocating illegal drug use." Maj. Typescript at 64.  The Majority can't have it both ways.  The decision to engraft Justice Alito's *Morse* concurrence onto *Fraser* erodes the analytical distinction between the two lines of cases and turns this appeal into some sort of *Fraser*/*Morse* hybrid.  "The law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges.  The relevant Supreme Court cases can be hard to reconcile, and courts often struggle to determine which standard applies in any particular case." *Doninger*, 642 F.3d at 353.  By using *Morse* to modify the distinct carve-out established in *Fraser*, the Majority has muddied the waters and further encumbered the ability of educators to run their schools.

The Majority attempts to make more palatable its decision to engraft *Morse*'s supposed prohibition of "any restriction of speech that can plausibly be interpreted as commenting on any political or social issue" onto *Fraser*.  For instance, it claims that "the [Supreme] Court did not believe that Fraser's speech could plausibly be interpreted as political or social commentary." Maj. Typescript at 27.  By claiming that such an interpretation of Matthew Fraser's "speech nominating a fellow student for student elective office," *Fraser*, 478 U.S. at 677, is wholly "implausible," the

18

Majority demonstrates the difficulties that arise when it blends together the disparate *Tinker* carve-outs.

As the Majority rightly notes, the *Fraser* Court opined that there was a "marked distinction between the *political* 'message' of the armbands in *Tinker* and the *sexual* content of Fraser's speech." Maj. Typescript at 28–29 (quoting *Fraser*, 478 U.S. at 680). That does not mean, however, that it was *implausible* to conclude that Fraser's speech was political. If it were truly implausible to "interpret[] [Fraser's speech] as commenting on any political or social issue," one must wonder why the United States Court of Appeals for the Ninth Circuit characterized Fraser's speech as "student political speech-making" and a "campaign speech[]." *Fraser v. Bethel Sch. Dist. No. 403*, 755 F.2d 1356, 1363 (9th Cir. 1985), *rev'd*, 478 U.S. 675 (1986); *id.* at 1368 (Wright, J., dissenting). The three appellate judges who heard Fraser's case were deemed by the Supreme Court to have erred when they likened his speech to *Tinker*'s armband, but that does not mean that it was "implausible" for those three judges to view Fraser's speech as political. It was, after all, a *campaign* speech.

A brief hypothetical further demonstrates the problems posed by the Majority's plausibility-based articulation of the *Fraser* carve-out. Suppose a student makes a speech at a school assembly. Like Matthew Fraser's speech, the content is about supporting a candidate for office, but the sexual references are muted enough such that the Majority would deem them "ambiguously lewd" instead of "plainly lewd." If the student's speech is about a classmate running for school office, the Majority would say that the school may punish the speaker. But if an identical speech is given and the classmate's name is replaced with the name of a candidate for

president, mayor, or even school board, the Majority would conclude that the First Amendment insulates the student's speech. In my view, the two speeches are indistinguishable under *Fraser*.

In sum, the Majority's approach vindicates any speech cloaked in a political or social message even if a reasonable observer could deem it lewd, vulgar, indecent, or plainly offensive. In both cases, the inappropriate language is identical, but the speech is constitutionally protected as long as it meets the Majority's cramped definition of "politics" or its as-yet-undefined notion of what constitutes "social commentary." *Fraser* repudiated this very idea. "The First Amendment guarantees wide freedom in matters of adult public discourse . . . . It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers *a political point*, the same latitude must be permitted to children in a public school." *Fraser*, 478 U.S. at 682 (emphasis added).

II

As noted, the Majority holds that "*Fraser* . . . permits a school to categorically restrict ambiguous speech that a reasonable observer could interpret as having a lewd, vulgar, or profane meaning," but only "so long as it could not also plausibly be interpreted as commenting on a social or political issue." Maj. Typescript at 61. It is important to emphasize here that, despite my disagreement with the second part of the Majority's formulation, I agree fully with its understanding of the objective-reasonableness inquiry compelled under *Fraser*. *See* Maj. Typescript 32–35 (discussing why "courts should defer to a school's decisions to restrict what a reasonable

20

observer would interpret as lewd, vulgar, profane, or offensive").[5]

---

[5] Though I believe an objective-reasonableness test is the correct interpretation of *Fraser*, its level of generality leaves something to be desired, particularly when one considers that the lower courts will look to our decision for guidance. The Majority states that "[i]t remains the job of judges . . . to determine whether a reasonable observer could interpret student speech as lewd, profane, vulgar, or offensive." Maj. Typescript at 33–34. But who is this "reasonable observer"? The Majority gives us clues: he "would not adopt an acontextual interpretation" and would consider "the plausibility of the school's interpretation in light of competing meanings; the context, content, and form of the speech; and the age and maturity of the students." Maj. Typescript at 34. I would add several more considerations. Most importantly, evolving societal norms counsel that what is "objectively" considered "lewd, profane, vulgar, or offensive" one day may not be so the next. *See, e.g.*, *Fraser*, 478 U.S. at 691 (Stevens, J., dissenting) ("'Frankly, my dear, I don't give a damn.' When I was a high school student, the use of those words in a public forum shocked the Nation. Today Clark Gable's four-letter expletive is less offensive than it was then."). Furthermore, given the diversity of opinions and perspectives across our country, the type of speech that may reasonably fall into one of the proscribable categories would vary widely from one community to the next. These considerations highlight the importance of ensuring that "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Fraser*, 478 U.S. at 683.

The Majority did not find that the school's interpretation of the bracelets' message as lewd was objectively unreasonable. *See* Maj. Typescript at 63 n.22 ("[W]e need not determine whether a reasonable observer could interpret the bracelets' slogan as lewd."). Thus, had the Majority not engrafted Justice Alito's concurrence in *Morse* onto the *Fraser* standard, my colleagues might agree that the school did not violate the First Amendment when it proscribed the bracelet. Because the Majority chose not to analyze whether the school was reasonable in determining that the bracelet could be proscribed under *Fraser*, however, I will briefly discuss why that is so.

In this close case, the "I ♥ boobies! (KEEP A BREAST)" bracelets would seem to fall into a gray area between speech that is plainly lewd and merely indecorous. Because I think it objectively reasonable to interpret the bracelets, in the middle school context, as inappropriate sexual innuendo and double entendre, I would reverse the judgment of the District Court and vacate the preliminary injunction.

The District Court correctly ascertained the standard of review to apply in a case that arises under *Fraser*, but proceeded to misapply that standard. First, by emphasizing whether Plaintiffs *intended* a vulgar or sexual meaning in their "I ♥ boobies!" bracelets and determining that a non-sexual, breast-cancer-awareness interpretation of the bracelets was reasonable, the Court inverted the proper question. Instead of asking whether it was reasonable to view the bracelets as an innocuous expression of breast cancer awareness, the District Court should have asked whether the school officials' interpretation of the bracelets—*i.e.*, as expressing sexual attraction to breasts—was reasonable. So

22

long as the School District's interpretation was objectively reasonable, the ban did not contravene the First Amendment or our school-speech jurisprudence.

Second, in its substantive conclusion that "I ♥ boobies!" cannot reasonably be regarded as lewd or vulgar, the District Court highlighted the bracelets' social value while disregarding their likely meaning to immature middle-schoolers.[6]  As the School District argues, the fact that

---

[6] In fact, we have questioned the applicability of the Supreme Court's student speech jurisprudence in the elementary and middle school settings:

> [A]t a certain point, a school child is so young that it might reasonably be presumed the First Amendment does not protect the kind of speech at issue here.  Where that point falls is subject to reasonable debate.

> In any event, if third graders enjoy rights under *Tinker*, those rights will necessarily be very limited.  Elementary school officials will undoubtedly be able to regulate much—perhaps most—of the speech that is protected in higher grades.  When officials have a legitimate educational reason—whether grounded on the need to preserve order, to facilitate learning or social development, or to protect the interests of other students—they may ordinarily regulate public elementary school children's speech.

Plaintiffs' laudable awareness message *could* be discerned from the bracelets does not render the School District's ban unconstitutional. "I ♥ boobies!" not only expresses support for those afflicted with breast cancer, but also conveys a sexual attraction to the female breast.

It is true that certain facts indicate that a sexual interpretation of the "I ♥ boobies!" bracelets may be at the outer edge of how a reasonable observer would interpret speech. Most obviously, the bracelets always modify the "I ♥ boobies!" phrase with "(KEEP A BREAST)" or other breast-cancer-awareness messages. "When one reads the entire

*Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417–18 (3d Cir. 2003); *see also Walz ex rel. Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 276 (3d Cir. 2003) (noting that "the age of the students bears an important inverse relationship to the degree and kind of control a school may exercise: as a general matter, the younger the students, the more control a school may exercise"). Other appellate courts share our misgivings, noting that "the younger the children, the more latitude the school authorities have in limiting expression." *Zamecnik*, 636 F.3d at 876 (citing *Muller ex rel. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1538–39 (7th Cir. 1996)); *see also Nuxoll*, 523 F.3d at 673 (when a school regulates the speech of children that are "very young . . . the school has a pretty free hand"); *Morgan*, 659 F.3d at 386 ("[I]n public schools, the speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students. Indeed, common sense dictates that a 7-year-old is not a 13-year-old, and neither is an adult." (alterations, citations, and internal quotation marks omitted)).

phrase, it is clearly a message designed to promote breast cancer awareness." *K.J. v. Sauk Prairie Sch. Dist.*, No. 11-cv-622, slip op. at 14 (W.D. Wis. Feb. 6, 2012). Additionally, school administrators did not immediately recognize the bracelets as vulgar or lewd; students had been wearing the bracelets for two months before they were banned, and teachers had to request guidance on whether and how to deal with the bracelets. Moreover, the school itself was compelled to use the word "boobies" over the public address system and school television station in order to describe the proscribed bracelets, which suggests that the word alone is not patently offensive.

Notwithstanding the facts supporting Plaintiffs' case, I conclude that "I ♥ boobies!" can reasonably be interpreted as inappropriate sexual double entendre. In the middle school context, the phrase can mean both "I support breast-cancer-awareness measures" and "I am attracted to female breasts." Many twelve- and thirteen-year-old children are susceptible to juvenile sexualization of messages that would be innocuous to a reasonable adult. Indeed, at least one bracelet-wearer acknowledged that "immature" boys might read a lewd meaning into the bracelets and conceded that she understood why the school might want to ban the bracelets, *B.H.*, 827 F. Supp. 2d at 399, and other students parroted the phrase on the bracelets while conveying sexual attraction to breasts. Another school administrator has concluded that the bracelets at issue here "elicit attention by sexualizing the cause of breast cancer awareness." *Sauk Prairie*, No. 11-cv-622, at 4. And as Judge Crabb, the only other federal judge to consider these bracelets, put it in *Sauk Prairie*, "hints of vulgarity and sexuality" in the bracelets "attract attention and provoke conversation, a ploy that is effective for [KABF's]

25

target audience of immature middle [school] students." *Id.* at 15. Finally, as the Gender Equality amicus brief points out, breasts are ubiquitously sexualized in American culture.

The Easton Area Middle School principals' willingness to say "boobies" to the entire school audience does not imply that the word does not have a sexual meaning; it merely suggests that "boobies" is not plainly lewd. Moreover, although KABF's decision not to market its products through porn stars and at truck stops is laudable, the interest such organizations have shown in the bracelets is further evidence that the bracelets are read by many to contain a sexual meaning. And the "I ♥ boobies!" bracelets' breast cancer message is not *so* obvious or overwhelming as to eliminate the double entendre. For one thing, the bracelets come in many colors other than the shade of pink widely associated with the fight against breast cancer.

Additionally, although Plaintiffs and their amici argue that the casual language of the "I ♥ boobies!" bracelets is intended to make breast cancer issues more accessible and less stigmatized for girls and young women, that purpose does not undermine the plausibility of a sexual interpretation of the bracelets. Nor does the fact that these Plaintiffs' mothers were happy not only to purchase the bracelets for their teenage daughters but also to wear them render the bracelets immune from school regulation. The mothers' intent that the bracelets convey a breast-cancer-awareness message, like Plaintiffs' own subjective motive, is irrelevant to interpreting the meaning of the speech.

Likewise, the School District administrators' subjective beliefs, expressed at the time of the ban and later during this litigation, do not affect my determination of

whether it is objectively reasonable to infer a sexualized meaning from the bracelets. Their failure to use the words "lewd," "vulgar," "indecent," or "plainly offensive" is not fatal to their claim of regulatory authority. Similarly, some principals' inconsistent testimony regarding what other breast-cancer-related phrases they might censor does not make the phrase at issue here more or less vulgar. Therefore, it is not probative that administrators intermittently indicated that they thought the word "breast" by itself has an impermissible sexual connotation.

Plaintiffs rely on the initial statements by teachers at the middle school that the word "breast" alone in any context and the phrases "breast cancer awareness" and "keep-a-breast.org" could also be banned to argue that the School District has left them no other means to convey their breast-cancer-awareness message. But those words were not banned—indeed, students are permitted to wear KABF's "check y♥urself!! (KEEP A BREAST)" bracelets—and the administrators changed their position prior to the evidentiary hearing, opining that such phrases would *not* be inappropriate at school. Also significant is the fact that the Easton Area Middle School has not stifled the message of breast cancer awareness; in the course of a robust breast cancer awareness campaign it merely imposed a permissible restriction on the *way* in which that message may be expressed. *See Saxe*, 240 F.3d at 213 ("*Fraser* speaks to the form and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint." (citation omitted)).

Nor is Plaintiffs' position saved by the fact that the "I ♥ boobies!" phrase was "chosen to enhance the effectiveness of the communication to the target audience." *B.H.*, 827 F. Supp. 2d at 406. The District Court's focus on the strategic

27

purpose of the words and format used in the bracelets was misguided. If indecency were permitted in schools merely because it was intended to advance some laudable goal, Matthew Fraser's speech would have been constitutionally protected insofar as he intended to win the attention of his classmates while advocating the election of his friend.

Finally, if we were to hold that the breast cancer message here makes any sexual reading of the bracelets unreasonable, schools would be obliged to permit more egregiously sexual advocacy messages. As Ms. DiVietro acknowledged, "other bodily parts in the human anatomy . . . can get cancer and . . . other types of slang terms" would have to be condoned. App. 275. DiVietro raised the specter of an "I ♥ Balls" slogan to support testicular cancer awareness. *Id.* at 275–76. These examples are not speculative. The Testicular Cancer Awareness Project sells "feelmyballs" bracelets to encourage male self-examinations and general awareness. *See* Testicular Cancer Awareness Project, http://www.feelmyballs.org/shop/front.php (last visited June 3, 2013). If middle school students have a constitutional right to wear "I ♥ boobies!" bracelets, it would be difficult to articulate a limiting principle that would disallow these other catchy phrases, so long as they were aimed at some socially beneficial objective.

Simply stated, the District Court correctly articulated the proper standard of review to be applied in cases that implicate *Fraser* (such as this one), but it strayed from that standard when evaluating the reasonableness of Plaintiffs' intended meaning. For that reason, and because the School District's reading of "I ♥ boobies!" as inappropriate sexual double entendre was a reasonable interpretation in the middle school context, I would hold that Plaintiffs cannot

28

demonstrate a likelihood of success on the merits of their claim. Accordingly, the District Court abused its discretion in granting a preliminary injunction.

*       *       *

As this case demonstrates, running a school is more complicated now than ever before. Administrators and teachers are not only obliged to teach core subjects, but also find themselves mired in a variety of socio-political causes during school time. And they do so in an era when they no longer possess plenary control of their charges as they did when they acted *in loco parentis*. *See, e.g.*, *Morse*, 551 U.S. at 413–16 (Thomas, J., concurring). The decisions school administrators must make regarding the deportment of their students—what they say, what they wear, or what they do—require common sense and good judgment. Many of those decisions will involve matters about which reasonable people can disagree. In the close cases, such as this one, there is virtue in deferring to the reasonable judgments of those responsible for educating our nation's youth. With respect, I dissent.

GREENAWAY, JR., *Circuit Judge*, dissenting, with whom CHAGARES, JORDAN, HARDIMAN and GREENBERG, join.

My colleagues have determined today that "I ♥ boobies" is an ambiguous phrase that may connote an attraction to female breasts, but which falls under the protection of the First Amendment in the middle school context because it may plausibly be interpreted as commenting on a political or social issue. Reasonable minds may come to varying conclusions on this test, but one thing is not open to debate: a school district faced with the same dilemma in the coming weeks, months, or years is given no greater guidance regarding its ability to determine whether a particular message may be proscribed than before the Majority opinion issued.

The Majority lauds the intent of the two middle schoolers responsible for introducing "I ♥ boobies! (KEEP A BREAST)" bracelets into their school, which encouraged serious discussion regarding a medical issue of increasing social import. Appellees' actions may or may not reflect an admirable maturity, but the intent of Appellees is not at issue. In many cases, when the First Amendment is implicated, the intent of the speakers will be admirable or at worst benign. The Majority concludes that, as long as the ambiguous speech may be interpreted by a reasonable person as plausibly related to a political or social issue, it is protected. Despite its express disavowal of intent as a consideration, the Majority inadvertently re-injects the students' intent into the fray by mandating an analysis of whether a political or social issue is addressed by the speech. This is improper but it is not my sole criticism.

1

The Majority's test leaves school districts essentially powerless to exercise any discretion and extends the First Amendment's protection to a breadth that knows no bounds. As such, how will similarly-situated school districts apply this amorphous test going forward? The Majority's test has two obvious flaws. First, what words or phrases fall outside of the ambiguous designation other than the "seven dirty words"? Second, how does a school district ever assess the weight or validity of political or social commentary? The absence of guidance on both of these questions leaves school districts to scratch their heads.

Practical problems with the Majority's test abound. Where and how do school districts line-draw regarding the nouns used to describe the subject matter of the particular awareness campaign? The Majority has established that at opposite ends of the spectrum are "boobies," on the one hand, and "tits," one of the "seven dirty words," on the other hand. What lies between those two extremes and how a school district is to make a principled judgment going forward remain open questions. No doubt, there are some words and phrases that all would agree should be afforded no protection in the middle school context, despite their use in promoting an important social issue. My recalcitrance to extend First Amendment protection to the slogan at hand is simple — why is this word, "boobies," different? Why does it deserve protection? Is "boobies" a term that is inherently innocuous or sophomoric, as the Majority asserts? As noted in the Majority, "ta tas" is used as the descriptive term in some breast cancer awareness campaigns. The ambiguity of "ta tas" in this context is beyond question. What also seems beyond question is that the school district, according to the Majority, must lay dormant to a student's use of "ta tas" or

2

any synonym of "breast" (other than "tits") as long as the student is commenting on a political or social issue, here, breast cancer awareness. The lack of certitude or a workable parameter unnecessarily handcuffs school districts.

What of the circumstance when an anatomically correct term is used in an awareness campaign? Applying the Majority's test, "I ♥ penises," "I ♥ vaginas," "I ♥ testicles," or "I ♥ breasts" would apparently be phrases or slogans that school districts would be powerless to address. Would the invocation of any of these slogans in a cancer awareness effort fail to garner protection under the Majority's test? It would appear not. What of the other slogans that the Majority mentions in its opinion that are sufficiently ambiguous? The Majority blithely states that "it does not enjoin the School District's regulation of other types of apparel, such as the 'Save the ta-tas' T-shirt or testicular-cancer-awareness apparel bearing the phrase 'feelmyballs.org.'" (Maj. Op. 71.) This is exactly my concern. What may a school district do? These phrases are both ambiguous and speak to political and social issues. How is a school district now better able to discern when it may exercise its discretion to impede the use of a particular slogan, as it relates to an awareness program, than before the issuance of this opinion?

The other practical problem which arises from application of the Majority's test is judging the validity of political and social comment. In the context of these social awareness campaigns, when would the students' involvement not invoke political or social comment? The constriction of "plausibly be interpreted as" adds little to our discourse. For instance, when would a student using a term that is admittedly ambiguous not be able to assert that the use of the offending

3

word, term, or phrase is speech that is commenting on a political or social issue?  What is the balancing that a school district can/should/may engage in to determine the merit or value of the proposed political or social comment?  The unabashed invocation of a lewd, vulgar, indecent or plainly offensive term is not what is at issue here; what is at issue is the notion that we have established a test which effectively has no parameters.  The political or social issue prong entirely eviscerates the school district's authority to effectively evaluate whether the student's speech is indeed protected.  This shortcoming in the application of the test exemplifies its inherent weakness — a failure to resolve the conundrum school districts face every day.

In light of the Majority's approach, school districts seeking guidance from our First Amendment jurisprudence in this context will find only confusion.  I cannot adhere to this approach.  I respectfully dissent.